FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | |
| | : | Case No. 25-MJ-468 |
| | : | |
| ERLEND OLSON, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of New Mexico, respectfully submits this memorandum in support of its oral motion that the defendant be detained pending trial pursuant to 18 U.S.C. §§ 3142(f)(2)(A), (B). The defendant orchestrated a scheme to defraud approximately 200 investors and lenders of more than $250 million, subjecting him to a potential life sentence under the government's preliminary estimate of the applicable sentencing guidelines. He has spent more than a decade going to great lengths to conceal his income and assets to avoid paying his taxes, including directly lying to government officials. He has significant foreign ties and is a dual citizen of St. Kitts and Nevis—a country that offers visa-free travel to many countries without extradition treaties. And he actively attempted to tamper with witnesses during the pendency of this investigation. Simply put, there is a serious risk that the defendant will flee prosecution and obstruct justice. As demonstrated below, the government can show by a preponderance of the evidence that there are no conditions or combination of conditions that can reasonably assure the appearance of the defendant. 18 U.S.C. § 3142(f)(2)(A).

The government requests that the following points and authorities, as well as any other

facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pretrial detention.

## I. <u>Procedural History</u>

The defendant is charged by indictment in the District of Columbia with one count of Conspiracy to Commit Wire and Mail Fraud, in violation of 18 U.S.C. § 1349, five counts of Wire Fraud, in violation of 18 U.S.C. § 1343, one count of Mail Fraud, in violation of 18 U.S.C. § 1341, and four counts of Tax Evasion, in violation of 26 U.S.C. § 7201. *See United States v. Olson et al.*, Case No. 25-CR-69-RCL. The defendant was arrested in the District of New Mexico and made his initial appearance before this Court on March 17, 2025. At that time, the government informed the Court that it was requesting detention based on the defendant's risk of flight and obstruction of justice. A detention hearing was requested for March 20, 2025.

## II. <u>Legal Authority and Argument</u>

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, a detention hearing must be held at the government's request if the defendant poses a serious risk of flight or obstruction of justice.  *See* 18 U.S.C. §§ 3142(f)(2)(A), (B). If after a hearing, the Court "finds that no conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). In assessing whether pretrial detention or release is warranted, the judicial officer must "take into account the available information concerning" the following four factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . the person's character, physical and mental condition,

family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The United States must prove a serious risk of flight by a preponderance of the evidence. *See United States v. Cisneros*, 328 F.3d 610, 613 (10th Cir. 2003); *United States v. Odegbaro*, 655 Fed.Appx. 630, 631–32 (10th Cir. 2016).

"The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the detention hearing." 18 U.S.C. § 3142(f). Consequently, the government may proceed by proffer. *See e.g.*, *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("Every circuit to have considered the matter . . . [has] permitted the Government to proceed by way of proffer.")

### A.    Nature and Circumstances of the Offense Charged

For investors, the defendant was the face of Theia Group Incorporated ("Theia")—a satellite company he founded that purportedly was going to revolutionize the world by providing continuous remote sensing data for the entire globe simultaneously. This data, collected from 112 satellites Theia planned to launch, would transform human ability to detect and respond to events, such as earthquakes, wildfires, crime, and global warming, as well as identify certain natural resources under the earth's surface. Theia never launched any satellites nor received any income. But the defendant and his co-conspirators raised more than $250 million from approximately 200 investors/lenders through a series of misrepresentations about Theia's financial position, contracts with third parties, and technical capabilities. Of that $250 million, the defendant took

approximately $9 million for himself, which he hid from the U.S. Government to whom he already owed more than $1 million.

The indictment, which is incorporated by reference and attached to this filing as Exhibit 1, provides a fulsome explanation of the investment fraud scheme and the defendant's tax evasion.

As indicated in the indictment, the defendant went to extreme lengths to deceive investors and to conceal the truth about Theia's business. For example, to substantiate the claim that Theia had $6 billion in escrow from sovereign nations who wanted access to data that would be generated from Theia's satellites, the defendant created a fake bank statement showing a balance of more than $6 billion. However, in doing so, the defendant took Theia's actual operating account ending in -8023 and simply added $6 billion to the balance.



Theia's True Account Statement                    The Fake Escrow Statement

Similarly, when pushed for audited or certified financial statements from an investment group interested in making a nearly $25 million in Theia, the defendant and his co-conspirators concealed the actual audit report performed by a renowned accounting firm. That audit showed that Theia had no revenue and no money in escrow. It also expressed "substantial doubt" that Theia would

4

continue as a going concern one year from the date the audited financial statements were issued. In an email, the defendant called the audit an "absolute disaster," and he and one of his co-defendants set out to find an alternative to provide to the investment group. The defendant and a co-defendant sent an accountant in Cypress false financial statements showing revenue and $6 billion in escrow and paid her $25,000 to "certify" the bogus statements. Those certified financials were then sent to the investment group, while the audit was concealed.

The defendant also curated his lies based on his audience. For example, on March 21, 2020, the defendant sent individual investors a question-and-answer document claiming: (1) Theia had $6 billion in escrow; (2) Theia had a contract with the U.S. government generating $3.8 million per month; and (3) Theia had $153 million in cash-on-hand. However, just six days later, on March 27, 2020, Olson sent a large institutional investor with the means to do more thorough due diligence a nearly identical question-and-answer document excluding any mention of billions of dollars in escrow or any current revenue.



| Sent to Individual Investors 3/21/2020 | Sent to Institutional Investors 3/26/2020 |

In reality, Theia had no money in escrow, no revenue, no contract with the U.S. government, and just over $2 million in cash.

The tax charges in the indictment show that the defendant's penchant for lies and deceit extended not just to investors, but also the government. Knowing that he owed more than $1 million to the IRS, the defendant ensured that the majority of his compensation from Theia was received through a holding company called Meridian Vector Corporation ("MVC"). The defendant

ensured that Theia never reported any of the defendant's income to the IRS and that none of the income derived from MVC was reported as well.

| Message | |
|---|---|
| From: | Erlend Olson [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8D518969227E445A9866003D3D450557-EOLSON] |
| Sent: | 2/3/2020 1:17:41 PM |
| To: | |
| Subject: | Fw: Your tax form is ready |

I do not receive a 1099 from THEIA. Please make sure that a 1099 is NOT sent to the IRS with respect to me.

Call me to discuss if needed.

Perhaps most brazenly, on April 2, 2018, the defendant purchased a personal Range Rover through MVC for more than $130,000. *See* Exhibit 2. One day later, on April 3, 2018, the defendant emailed an Assistant United States Attorney in the Central District of California stating he did not have the means to pay an approximate $90,000 penalty for failing to file a Report of Foreign Bank and Financial Accounts (FBAR) and needed to negotiate a payment plan. *See* Exhibit 3.

The defendant's conduct in this case is egregious. And his pattern of lies and deceit in this case alone should give the Court no confidence that he could comply with any combination of conditions of release. Such serious misconduct exposes the defendant to severe consequences. If convicted of every charge in the indictment, the defendant faces a maximum sentence of 160 years' incarceration, and the government computes his advisory guideline sentence as life in prison, given the size of the loss, the nature of the scheme, and the defendant's role in the crime. The possibility of such a substantial sentence incentivizes desperate measures, such as flight and witness tampering. The nature and circumstances of the crime thus weigh heavily in favor of detention.

6

B. <u>**Weight of the Evidence Against the Defendant**</u>

The second factor to be considered, the weight of the evidence, also demonstrates the necessity for detention. The evidence against the defendant is very strong. The government has spoken to dozens of investors, who all describe the defendant as the primary purveyor of the false information material to their investments. Moreover, the government need not only rely on witness testimony. The defendant is on a number of recorded calls and videos stating Theia had $6 billion in escrow, millions of dollars in monthly revenue, revenue producing government contracts, and more than $100 million in cash-on-hand. None of which was true.

Numerous Theia employees and principals have also been interviewed in this investigation. Their testimony, along with thousands of documents, paint a clear picture: nothing happened at Theia without the defendant's knowledge. He cannot claim he was unaware that the information he peddled to investors was false. Such a claim is not supported by the record.

For example, with respect to the fake escrow statement, the defendant used the same playbook in a scheme in his personal life. In July 2020, the defendant and his wife were looking to purchase luxury homes in Las Vegas, Nevada. Because of the high price range, the agent that they were working with requested "proof of funds or financials to submit to the sellers" to book showings of potential homes. In response, the defendant repurposed and further altered the fake escrow statement he derived from Theia's actual bank statement. This time, instead of adding $6 billion to Theia's bank statement, the defendant only added $10 million. However, he made a mistake, leaving the word "escrow" on the statement. *See* Exhibit 4.



Theia's True Account Statement                              The Fake Escrow Statement



Sent to Las Vegas Real Estate Agent

The defendant was the founder, owner, primary manager, and primary fundraiser for Theia.

The evidence clearly shows he told scores of lies to investors, which he knew were false. In sum,

8

the weight of the evidence is strong. And such formidable evidence in concert with huge sentencing exposure creates a strong incentive to flee. This factor weighs heavily in favor of detention.

### C.    The Defendant's History and Characteristics

The defendant has a criminal history, business history, and personal characteristics all suggesting that no combination of conditions would assure his appearance in Court.

*The Defendant's Criminal History*

The defendant has two prior convictions for driving under the influence of alcohol or drugs. It is his performance under supervision on those cases, though, that suggests he could not abide by conditions of release. On February 27, 2009, the defendant was found guilty in Orange County Superior Court Case 08HM011947 of driving under the influence. On April 29, 2009, he was sentenced to three years of probation. Within two months, on June 25, 2009, the defendant had already violated his probation. On December 28, 2009—less than eight months after being sentenced—the defendant violated probation again and had his probation revoked. He was sentenced to 30 days in jail followed by an additional period of probation.

Less than a year after his release from jail and while still on probation, the defendant was again arrested on December 17, 2010. He was charged with driving under the influence of drugs and alcohol and plead guilty on February 15, 2012. The defendant was sentenced to 45 days in jail followed by five years of probation.

*The Defendant's Business History and History of Dishonesty with the Government*

The indictment in this case details the defendant's history of lies dating back to 2017, but his history of deception spans nearly a decade earlier. Prior to Theia, the defendant was the founder and Chief Executive Officer of a company call Terralliance. *See* Exhibit 5. Terralliance sought to

use remote sensing technology to map underground oil and gas reservoirs and other minerals. *Id*. That information purportedly could then be used to assist petroleum engineers in deciding where to drill. *Id*. In 2008, the defendant was negotiating $1.1 billion in financing from the sovereign wealth fund of Singapore (the "Wealth Fund"). *Id*. Before closing the deal, an independent audit revealed that the defendant had spent more than $4 million on personal expenses to include family vacations, visits to gentlemen's clubs, and jewelry purchases. *See* Exhibits 6 & 7. Passport Management ("Passport"), a hedge fund, agreed to make a bridge loan to Terralliance while it attempted to close the deal with the Wealth Fund, but only if the defendant agreed to repay $4,438,989 to Terralliance. Exhibit 6 at 1-2. The defendant executed a promissory note for the amount but defaulted on the note. Exhibit 6 at 2. The defendant was terminated by Terralliance, which itself defaulted on the bridge loan from Passport Capital. Exhibit 6 at 2. The note was assigned to Passport, who eventually sued the defendant to collect on the note. *See Passport Management, LLC v. Olson*, 30-2010-346521 (Cal. Super. Ct.).   After a trial, the court in that case ruled that Olson in fact owed the money to Passport. *See* Exhibit 6 & 8. As outlined in numerous news articles about the defendant's time at Terralliance, there are many similarities to the instant case, including misrepresentations to investors and lenders. *See* Exhibit 5. However, the judge's order in the Passport lawsuit and the defendant's embezzlement of millions of dollars of Terralliance funds is indicative of the defendant's pattern of dishonesty, which make release conditions untenable.

Additionally, as described in the indictment and above, the defendant's tax evasion scheme involved various lies and omissions to the government, including the lies to the Assistant United States Attorney in California described, *supra*. The investigation in this case also revealed that the

defendant lied under penalty of perjury. For example, the defendant had a large outstanding California franchise tax liability. In February 2019, he filled out a financial statement with the California Franchise Tax Board to show that he had a financial hardship and seek a payment plan. Exhibit 9. On that form, which the defendant signed under penalty of perjury, the defendant vastly underreported his income and concealed the MVC bank account. *Id*. Most egregiously, the defendant claimed he was paying $10,200 in monthly estimated tax payments, when he was paying no taxes and actively evading payment. *Id*. This, like all of the defendant's dishonest conduct, demonstrates that the defendant could not be trusted to comply with release conditions, even if he swore to do so under oath.

### *The Defendant's Personal Characteristics*

The defendant is a 61-year-old man with no ties to the District of Columbia. He has gone out of his way to keep no assets in his name. And in addition to his outstanding tax liability, he faces significant civil exposure in current and future litigation on notes in Theia he personally guaranteed. A bond is not a viable option and any type of home confinement with location monitoring in New Mexico is not feasible, as he would necessarily have to travel regularly to the District of Columbia to face prosecution in this case.

It is the defendant's foreign ties, though, that are most concerning. As outlined in the indictment and the materials provided on Terralliance, the defendant has cultivated a large network of contacts with means inside and outside the United States throughout the previous decades. He has also, at times, had access to private air travel.

In 2007, the defendant and his wife paid $250,000 to become a citizen of St. Kitts and Nevis ("SKN") and obtained a passport. Exhibits 10 & 11. An SKN passport allows visa-free travel

to more than 100 countries, including numerous countries with which the United States does not have extradition treaties. *Visa-Free Countries*, https://www.foreign.gov.kn/travel/.

Evidence in this case shows the defendant has previously considered using his SKN citizenship to circumvent rules. In June 2020, the defendant sought to travel to France for business, but Covid restrictions prevented travel from the United States to the European Union. The defendant suggested traveling to France from SKN as an SKN citizen. Exhibit 12. He even suggested falsely claiming to French authorities that he resided in Ireland with an associate. Exhibit 12.

While the defendant's known SKN passport is currently expired, the defendant's own words in evidence collected in this case demonstrate that an expired passport or even surrendering passports does little to mitigate his risk of flight. Exhibit 13. In 2015, the defendant's wife (J.O.) was involved in legal proceedings and eventually held in contempt. In an email, the defendant outlined why J.O. surrendering all her passports would do little to prevent her from fleeing. *Id*. Specifically, the defendant stated,

> I would add that [J.O.] producing her passports (even if she does, in fact, produce them all) does little to stop her from fleeing. Her most likely course of action is to go to SKN on a private yacht . . . It would only be a couple day trip, and [J.O.] probably has the cash on her to pay for it straight away . . . On arrival in SKN sans passport, she will say she lost her passport and obtain a new one, since she is a citizen of that country. As you may know, an SKN passport allows visa-free travel [to] more countries than just about any passport but maybe a UK passport.

*Id*.

It is clear that the defendant has thought about how to flee. Through his SKN citizenship and wealthy contacts, he has means to flee. And given his criminal exposure and evidence against him, he has a motivation to flee. He has previously failed under court-ordered supervision and has a history of lying to the government, even under penalty of perjury. This factor overwhelmingly

12

favors detention.

###  D.    Danger to the Community

The fourth factor is the nature and seriousness of the danger to any person or the community posed by the defendant's release. Throughout the course of the investigation in this case, the defendant has attempted to tamper with witnesses or otherwise impede the government's investigation. As courts have recognized, such obstruction of justice constitutes a type of danger to the community. *See United States v. LaFontaine*, 210 F.3d 125, 134–35 (2d Cir. 2000) (holding that witness tampering in a white-collar case could support a finding of dangerousness under the 3142(g) factors).

The investors in this case have a deep desire to recoup the money they invested in Theia. Generally, investigators have heard from witnesses that the defendant suggested cooperation with the government's investigation and particularly, the prosecution of the defendant, would impede the ability of a buyer to purchase Theia's assets from receivership and make the investors whole. In an email to Associate 1 from the indictment—who provided updates to many investors—the defendant suggested that the potential buyer of Theia's assets would not want to work with those who cooperated with the investigation. Using coded and qualified language, the defendant stated the buyer "will likely give opportunity to those who supported him closing," while not wanting to work with those who are making it "more difficult to keep [Theia's] core team intact." The defendant went on to say, "So, it would be suggested by some that those who get subpoenas from [the lead investigator] exercise their due process rights according to the best and proper way that preserves their potential future with all things that could become very positive." *See* Exhibit 14.

The defendant's most concerning incidence of witness tampering, though, involved

messages with Witness-1 over Signal—an encrypted messaging application. Throughout the conversation, which is excerpted as Exhibit 15, the defendant: (1) assisted in drafting a statement to be provided to the lead investigator; (2) suggested several times that Witness-1 ask for immunity to "delay" the investigation; (3) suggested that the defendant would make sure Witness-1's legal fees were paid; and (4) told Witness-1 to withhold specific pertinent information.

The defendant took these actions prior to the case being charged. Now, that he has been indicted and is facing a potential life sentence, there is reason to think the defendant will take desperate measures to avoid a conviction. This factor, too, weighs in favor of detention.

### III. <u>Conclusion</u>

After examining the four factors, the Court should find by a preponderance of the evidence that there are no conditions or combination of conditions that will ensure the defendant's appearance at future court hearings, and that he should be detained. Therefore, the government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

HOLLAND S. KASTRIN
ACTING UNITED STATES ATTORNEY

_Rachel eagle_ for

JOSHUA GOLD
Assistant United States Attorney
TX Bar Number 24103101
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-815-8965
Email: Joshua.Gold@usdoj.gov

EXHIBIT 1

RECEIVED

MAR 1 3 2025

Clerk, U.S. District and
Bankruptcy Courts

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** |
| v. | **VIOLATIONS:** |
| **ERLEND OLSON,** (Counts 1-11) | **Count 1: 18 U.S.C. § 1349** (Conspiracy to Commit Wire and Mail Fraud) |
| **JOHN J. GALLAGHER,** (Counts 1-7) | **Counts 2-6: 18 U.S.C. §§ 1343, 2** (Wire Fraud and Aiding and Abetting) |
| **STEPHEN BUSCHER,** (Counts 1, 4-6) | **Count 7: 18 U.S.C. §§ 1341, 2** (Mail Fraud and Aiding and Abetting) |
| **JOSEPH FARGNOLI,** (Counts 1, 5-6) | **Counts 8-11: 26 U.S.C. § 7201** (Tax Evasion) |
| and | |
| **JAMIL SWATI** (Counts 1, 6), | **FORFEITURE ALLEGATION:** 18 U.S.C. §§ 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c) |
| **Defendants.** | |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates
and at the approximate times stated below:

### Background

1.      Defendant **ERLEND OLSON** ("**OLSON**") was an engineer and inventor. In 2015,
**OLSON** founded Theia Group Incorporated ("Theia") and during the life of the company held
various leadership positions including Chief Operating Officer, Chief Scientist, and Chief
Executive Officer ("CEO"). **OLSON** held an ownership interest in Theia through an entity called
Meridian Vector Corporation ("MVC"). **OLSON** resided in New Mexico.

2.    Defendant **JOHN J. GALLAGHER** ("**GALLAGHER**") was an attorney who was involved with Theia since at least 2016. **GALLAGHER** was the founding partner of Gallagher Law, P.C. in Philadelphia, Pennsylvania. **GALLAGHER** held various leadership positions at Theia including Executive Vice President. **GALLAGHER** was also a member of Theia's Board of Directors. At various times, **GALLAGHER** was the majority shareholder of MVC. **GALLAGHER** resided in Pennsylvania.

3.    Defendant **STEPHEN BUSCHER** ("**BUSCHER**") had a background in finance and worked as a consultant for Theia beginning in November 2019. **BUSCHER** was Chief Financial Officer ("CFO") of Theia from February 2021 through August 2021 and held himself out as the CFO of Theia for a period before that. **BUSCHER** resided in Colorado, Florida, and Washington, D.C.

4.    Defendant **JOSEPH FARGNOLI** ("**FARGNOLI**") was an engineer who was involved with Theia since shortly after its founding in 2015. At various times, he represented himself as a co-founder of Theia with **OLSON**. **FARGNOLI** was Chief Technology Officer of Theia and held an ownership interest in the company. **FARGNOLI** resided in New York.

5.    Defendant **JAMIL SWATI** ("**SWATI**") had a background in finance and first invested in Theia in March 2018. In 2020, **SWATI** organized Investment Group 1, which invested approximately $25 million in Theia in January 2021. In August 2020, **SWATI** was hired by Theia as the Head of Strategic Investments. **SWATI** resided in New York.

6.    Theia was incorporated in the State of Delaware on September 9, 2015. During the relevant period, Theia was headquartered in Philadelphia, Pennsylvania and Washington, D.C.

7.    MVC was incorporated in the State of Delaware on December 11, 2015. MVC used as its address the address of **GALLAGHER**'s law firm in Philadelphia, Pennsylvania. At the time

2

of its formation, **OLSON** was the sole shareholder of MVC, but ownership changed multiple times at varying percentages between **OLSON** and **GALLAGHER**. MVC was the majority shareholder of Theia.

## The Business of Theia

8.      Theia was a start-up aerospace company that advertised plans to launch 112 satellites, to be known as the Theia Satellite Network ("TSN"), which would provide continuous remote sensing data covering the entire globe simultaneously. According to Theia, the data obtained from the TSN and the speed with which it could be processed by Theia would transform human ability to detect and respond to events, such as earthquakes, wildfires, crime, and global warming, as well as identify certain natural resources under the earth's surface. Theia asserted that this information would be invaluable to government and commercial clients.

9.      Theia estimated that launching the TSN would cost between ten and fifteen billion dollars. The target launch date for the satellites was sometime from 2022 to 2025. While Theia initially raised money and developed plans for the TSN, it sought to generate revenue and prove its concept prior to the launch of the TSN by equipping aircraft with its remote sensing technology to generate data.

10.      Theia's primary funding strategy was the Master Partner Program ("MPP"). Under the MPP, Theia would secure sovereign nations as funding partners by offering data and data analysis from Theia's planned satellite network in perpetuity in exchange for an upfront payment, usually $2 billion. While the MPP nations waited for the launch of the TSN, they would purportedly receive data and services from Theia's aircraft program. Theia never received any funds from any country under the MPP despite claims to the contrary made to prospective investors.

3

11.    Instead, Theia was funded exclusively by more than $250 million in loans and investments from institutional and individual investors and lenders. Most, if not all, of these investments were fraudulently obtained by Theia misrepresenting its financial position, contracts with third parties, and technical capabilities.

### Fraudulent Solicitation of Friends and Family Investors

12.    Because securing investment from foreign governments would take significant time and resources, Theia, and particularly **OLSON** and **GALLAGHER**, used their network of personal and business contacts to obtain private investments in Theia. This group of investors was known informally within Theia as the "Friends and Family Investors" ("F&F"). From Theia's inception through mid-2021, Theia raised approximately $75 million from approximately 200 F&F investors. These investments took the form of convertible promissory notes, which guaranteed varying rates of return over various periods and generally included an option to convert the investment into Theia shares at the investor's discretion if certain conditions were met.

13.    These investors received and relied upon background materials and supporting documents about Theia that materially misrepresented Theia's financial position, contracts with third parties, and technical capabilities. **OLSON, GALLAGHER,** and others provided materially false updates to many of the F&F investors after their investments in an attempt to either persuade them to invest more money or dissuade them from redeeming their notes at maturity. These materially false updates convinced many investors to extend their notes until an equity conversion event, which never occurred.

### *Investor 1*

14.    An early F&F investor was Investor 1. Investor 1 was introduced to Theia as an investment opportunity by Associate 1, a longtime associate of **OLSON** in 2016. Investor 1

4

researched the potential investment and received information about Theia primarily from Associate 1, who in turn received his information directly from **OLSON**. In January 2017, Investor 1 and their spouse invested $100,000 in Theia in exchange for a one-year convertible promissory note. While Investor 1 considered a potential investment in Theia, **OLSON** falsely represented through Associate 1 that Theia had, to that point, raised in excess of $20 million. This claim was critical to Investor 1's decision to invest. In reality, Theia had only raised approximately $1 million.

15.     From February 2017 through April 2020, Investor 1 invested additional money in Theia, totaling $410,000, based on misrepresentations from **OLSON**. Throughout that period, with the encouragement of **OLSON** and Associate 1, Investor 1 also introduced dozens of individuals to Theia, resulting in approximately $7 million in F&F investments. Investor 1's initial $100,000 investment was returned. But Investor 1 has received neither a return of the additional $410,000 investment, nor any of the promised investment returns on the $410,000.

### *Investors 2 & 3*

16.     In September 2019, Investors 2 and 3 encountered Investor 1 at a high school soccer game. Investor 1 told Investors 2 and 3 about Theia and said that the company was seeking additional investors. On September 28, 2019, Investor 1 sent Investors 2 and 3 an email with information from an investor question-and-answer document ("Q&A") created by **OLSON**.

17.     The Q&A was littered with misrepresentations. It stated Theia was in immediate need of raising $25 million because it had "been asked to fly aircraft producing specialized analytic results from combined sensor technologies for the US Government." **OLSON** claimed that Theia "presently [had] one aircraft equipped and flying on contract and [wished] to build 2 more

immediately. Each aircraft costs approximately $25M to acquire, equip, and prepare for operations

. . . [Theia] can put up to 5 total in service under the existing contract."

> **THEIA IS LOOKING TO RAISE A MINIMUM OF $25 MILLION IMMEDIATELY**
> **And IS ACCEPTING QUALIFIED INVESTORS.**
>
> **USE OF PROCEEDS IS TO ACQUIRE AND EQUIP ADDITIONAL AIRCRAFT.**
>
> The company has been asked to fly aircraft producing specialized analytic results from
> combined sensor technologies for the US Government. We presently have one aircraft
> equipped and flying on contract and wish to build 2 more immediately. Each aircraft costs
> approximately $25M to acquire, equip and prepare for operations. In addition to immediate
> revenue, the data flow off the aircraft and analytic results is preparing some USG agencies to
>
> [REDACTED]
>
> prepare for the flood which will come from the TSN. We can put up to 5 total in service under
> the existing contract.

In reality, Theia did not have an aircraft "flying on contract" and never had any revenue-producing

contract with the U.S. government.

18.    **OLSON** falsely claimed in the Q&A that six countries had committed to the MPP

and that "2 of those are hard commitments with cash escrowed." Theia did not have six countries

committed and had no MPP investment in escrow at that time or ever.

19.    Investor 1 forwarded additional information created by **OLSON** to Investors 2 and

3 via email. This included quarterly updates that provided investors with the supposed status of,

among other things, the MPP and Theia's interim aircraft project.

20.    For example, in the 2nd Quarter 2019 report, **OLSON** stated, "Theia's first

government contract is expected to begin producing revenue in August, with first payment in

September." In the 3rd Quarter 2019 report, **OLSON** stated, "Theia's first government contract

began producing revenue in August, with payment received in September." Theia had no government contract and received no such revenue.

21.     On October 13, 2019, Investors 2 and 3 invested $600,000 in Theia in exchange for a convertible promissory note. Their decision to invest was based largely on the false claims regarding government contracts, revenue, and MPP commitments.

22.     Investors 2 and 3 continued to receive quarterly updates and other information about the status of Theia from **OLSON** via Investor 1. Through April 2021, Investors 2 and 3 invested an additional $760,000 in Theia. These investments were made in reliance on **OLSON**'s misrepresentations in the quarterly updates and other investor materials regarding government contracts, revenue, and the status of the MPP. To date, Investors 2 and 3 have neither received a return on their investment nor return of their investment capital.

*Investor 4*

23.     In March 2020, Investor 1 contacted Investor 4 about the opportunity to invest in Theia. On March 5, 2020, Investor 1 sent Investor 4 the identical information included in the September 28, 2019 email sent to Investors 2 and 3. Approximately one week later, Investors 1 and 4 met in person to discuss Theia further. Following that meeting, Investor 1 put Investor 4 directly in touch with **OLSON**, as they evaluated a potential investment.

24.     While Investor 4 waited to connect with **OLSON**, Investor 1 put together a list of questions, the answers to which Investor 1 believed would assist Investor 4 in evaluating Theia. Investor 1 sent the questions to Associate 1, who forwarded them to **OLSON**.

25.     On March 21, 2020, **OLSON** answered Investor 1's questions on a recorded audio call. On that call, **OLSON** made numerous false representations, including: (1) that Theia had $6 billion in escrow received from MPP nations, when it had no money in escrow; (2) that Theia had

$153 million in cash, when in fact the company had no more than a few million dollars; and (3) that Theia was producing $3.8 million in net cash flow per month from government contracts, when Theia had no contracts or revenue.

26.    Based on these false representations, Investor 4 invested $1 million in Theia on March 30, 2020, in exchange for a convertible promissory note. To date, Investor 4 has received neither a return on their investment nor return of their investment capital.

27.    The questions and their answers provided by **OLSON** on the March 21, 2020 audio call were reduced to writing into a Q&A and shared with Investors 1 and 4. Furthermore, those written questions and false answers or derivative versions of that Q&A were provided to other investors.

### *Investor 5*

28.    In Spring 2020, Investor 5 was connected with Theia via Associate 1—a friend of Investor 5's father. Associate 1 provided Investor 5 with the Q&A **OLSON** created for Investor 4 on March 21, 2020. Associate 1 also connected **OLSON** directly with Investor 5, and the two spoke over the phone regarding Theia.

29.    From the Q&A, Investor 5 was particularly interested in Theia's purported bank account balance of $153 million.

**The Current State of THEIA**

Can you speak to current financials...?

1.  **What is your current cash level as an entity?**
    A: Circa $153M excluding funds in escrow or funds ring-fenced for MPP aircraft programs which cannot be spent on TSN or general THEIA activities. Of that $153M,

30.    Investor 5 asked for supporting documentation to substantiate the balance. On April 17, 2020, **OLSON** sent Associate 1 an email attaching a purported March 2020 Theia bank

statement from Bank 1 with instructions to share it with Investor 5 via video conference but not to email it to Investor 5.

31.     Via video conference, Investor 5 was shown a purported bank statement showing a balance of more than $100 million. However, as of March 31, 2020, Theia's primary operating account ending in -8023 at Bank 1 held a balance of just slightly over $2 million.

32.     Investor 5 was also motivated to invest, in part, due to that falsified bank statement and **OLSON**'s claim of $6 billion held in escrow from sovereign nation MPP partners and additional billions of dollars in claimed commitments. In the March 21, 2020 Q&A, **OLSON** represented that the three greatest threats to Theia receiving the claimed $14 billion necessary to launch the TSN were: "(1) Covid kills nearly everyone on earth . . . (2) The entire Theia executive team are killed somehow [; and] (3) The US defaults on treasuries and loses the $6B we have in escrow (held in treasuries)."

1. **What are your top 2-3 greatest threats that would prevent the $14 Billion funding to happen?**
   A:
   (1) Covid kills nearly everyone on earth (i.e. some unimaginable crisis, which had it not been for Covid we would not even mention, as this sort of thing is always a theoretical threat to every business, both young and old)
   (2) The entire Theia executive team are killed somehow.
   (3) The US defaults on treasuries and loses the $6B we have in escrow (held in treasuries).

33.     On April 20, 2020, Investor 5 wired $2 million to Theia in exchange for a convertible promissory note. When Investor 5 received the Theia investor materials, had a conversation with **OLSON**, and initiated the wire, Investor 5 was in Washington, D.C. To date, Investor 5 has received neither a return on their investment nor return of their investment capital.

*Investors 6, 7, & 8*

34.    Investor 6 knew **OLSON** personally and invested a total of $850,000 in Theia from January through June 2020. On October 19, 2020, **OLSON** reached out to Investor 6 via email with a new investment opportunity in a Theia entity. **OLSON** attached a document entitled "201018 FREQUENTLY ASKED QUESTIONS AND BACKGROUND FOR NEW RAISE."

35.    In that document, **OLSON** falsely claimed, among other things, (1) "Theia had signed definitive documents with MPP counterparties for $18.5B, with each government's $2B due up-front within 180 days;" (2) "6B of the funds [had] been set aside/escrowed;" and (3) excluding the purported MPP money, "THEIA [had] raised over $600M," including money from "2 significant wall-street investment firms[.]" In reality, Theia did not have signed definitive documents with MPP sovereign government counterparties for $18.5 billion, it did not have any MPP money set aside in escrow, and it had raised less than half the purported amount.

36.    Shortly after receiving this email, Investor 6 invested another $200,000 in Theia in exchange for a convertible promissory note. Additionally, **OLSON** offered Investor 6 a financial incentive to recruit other investors using these materials, namely, 10% of the amount raised.

37.    On October 29, 2020, Investor 7 learned about the investment opportunity in Theia from another prospective investor whom Investor 6 sought to recruit and received the document **OLSON** attached to the October 19, 2020 email to Investor 6. Investor 7 was interested in possibly investing and was put in touch with **OLSON** directly.

38.    On November 27, 2020, **OLSON** and Investor 7 started an email chain directly with each other, where **OLSON** answered Investor 7's questions about Theia. On that date, Investor 7 asked **OLSON** for a Theia balance sheet that reflected the claimed $6 billion in

escrowed MPP funds. That same date, **OLSON** sent a false balance sheet claiming total assets in excess of $25 billion and making reference to the $6 billion of MPP funds that were in escrow.

39.     On December 1, 2020, Investor 7 asked **OLSON** whether there were third-party verifications of the $6 billion in escrow. That same day, **OLSON** sent Investor 7 an email from Washington, D.C., where he stated, "Yes we have third party verification of the amounts in escrow. We are happy to show it to you, but you would have to come to our offices to see it."

40.     On December 1, 2020, Investor 6 was in Virginia visiting their parent—Investor 8. Investor 6 offered to visit Theia's Washington, D.C. office while they were in the area and view the escrow statement on behalf of themself, Investor 7, and two other potential investors who were not in the area. Investor 7 agreed.

41.     On December 6, 2020, Investor 6 visited Theia's Washington, D.C. headquarters with Investor 8. In the presence of **OLSON** and **FARGNOLI**, Investor 6 was shown a fake escrow statement with a balance in excess of $6 billion.

42.     On December 6, 2020, Investor 6 sent Investor 7 an email, stating, "I reviewed Theia's confirmation of the escrow account that had a balance of $6 billion (and change from accrued interest) today at their office. I'm happy to answer any additional question you might have."

43.     On December 11, 2020, Investor 7 received a convertible promissory note in exchange for $50,000 countersigned by **OLSON** on behalf of Theia. On December 11, 2020, Investor 8 wired $1 million in exchange for a convertible promissory note. Investors 6, 7, and 8 have received neither a return on their investment nor return of their investment capital.

**The Fake Escrow Letter**

44.     In early January 2020, **GALLAGHER** approached Attorney 1—his relative—about a Theia business opportunity. Specifically, **GALLAGHER** and **OLSON** wanted Attorney 1 to sign a letter confirming that Theia had $6 billion in MPP funds set aside in an escrow account, despite Theia having no MPP funds in escrow. On January 6, 2020, **GALLAGHER** forwarded an email from **OLSON** to Attorney 1, with an attached draft escrow letter dated December 31, 2019. On January 9, 2020, Attorney 1 traveled to Theia's Washington, D.C. headquarters and met with **GALLAGHER** and **OLSON**, among others, to discuss the opportunity for Attorney 1 to act as an escrow agent for MPP funds that Theia purportedly had in escrow.

45.     **GALLAGHER** arranged for Attorney 1 to return to Theia headquarters on January 14, 2020. There, Attorney 1 met with **GALLAGHER** and **OLSON** to discuss further the escrow agent opportunity. That same day, Attorney 1 and **GALLAGHER** signed a retention agreement drafted by Attorney 1 that described the scope of Attorney 1's work as "general corporate matters and Delaware-related matters." However, **GALLAGHER's** signature appeared on another, forged retention agreement that described the scope of Attorney 1's work as follows: "Client [Theia] is seeking the Firm to act as an escrow agent on Behalf of Theia Group Inc., and to the extent necessary under the contracts between the Client and other MPPs, for each of the countries of the Master Partner Program ("MPP")." Attorney 1's signature appeared on that retention agreement, but they did not sign it or authorize it to be signed on their behalf.

46.     During the January 14, 2020 meeting at Theia's headquarters, Attorney 1 was also shown a fake December 2019 escrow statement purporting to show a balance of more than $6 billion. The fake escrow statement purported to be from Bank 1 and contained the account number for Theia's true account at Bank 1 ending in -8023. Specifically, the fake escrow statement

reflected an account balance of $6,000,859,314.63. In truth, that account had a December 2019 balance of $859,314.63—exactly $6 billion less than the amount shown on the fake escrow statement. The fake escrow statement was identical to the December 2019 statement on Theia's true account except for the balance and the substitution of the word "escrow" in two locations as indicated below. **GALLAGHER** was a signatory on the true account and oversaw the alleged MPP.



Theia's True Account Statement          The Fake Escrow Statement

47.     Following the viewing of the fake escrow statement, Attorney 1 agreed to sign a letter confirming that Theia had $6 billion in escrow from three MPP participants. Around that time, **OLSON** and **GALLAGHER** used the letter to try to obtain the participation in the MPP of an additional party. However, as described below, the letter was also repurposed to show potential investors.

**Fraudulent Solicitation of Investment of Investment Group 1**

48.     In May 2020, **SWATI**, an individual investor in Theia, and Associate 2 were considering forming an investment vehicle to make a high-dollar investment in Theia via an aggregation of numerous potential investors—Investment Group 1. **SWATI** and Associate 2

engaged Law Firm 1 to assist in due diligence of Theia and corporate matters related to Investment Group 1.

49.    Throughout May and early June 2020, **SWATI** and Associate 2 began asking **OLSON** preliminary due diligence questions about Theia. A meeting was scheduled at Theia's headquarters in Washington, D.C. for June 17, 2020, with **SWATI**, Associate 2, and Attorney 2 from Law Firm 1.

### *The June 17, 2020 Meeting*

50.    In anticipation of the June 17, 2020 meeting, **GALLAGHER** texted Attorney 1 stating, "[N]eed an update verification for Erlend [**OLSON**] for Wednesday morning [June 17, 2020] in DC. Please call." On June 15, 2020, **OLSON** sent Attorney 1 a fake May 2020 escrow statement showing the same balance of more than $6 billion as the fake December 2019 escrow statement. At that time, Theia's actual account at Bank 1 had a balance of approximately $5 million. After seeing the May 2020 fake statement, Attorney 1 agreed to sign an updated letter. On June 16, 2020, Attorney 1 mailed the signed updated escrow letter from New Jersey to **GALLAGHER** at Theia's headquarters in Washington, D.C.

51.    At the June 17, 2020 meeting, **SWATI**, Associate 2, and Attorney 2 were shown a false and fraudulent statement showing $6 billion in escrow for Theia and the accompanying third-party confirmation letter signed by Attorney 1 dated June 1, 2020. Other than the date, that letter was virtually identical to the January 2020 letter created by **GALLAGHER** and **OLSON** for the purpose of showing the potential MPP participant, which was signed by Attorney 1.

14

52.    The escrow letter stated the following:

June 1, 2020

To:  Theia Group Inc.
     John J. Gallagher, Esquire
     Member of the Board of Directors
     Audit Committee
     1455 Pennsylvania Ave NW Suite 800
     Washington DC 20004

Dear Director Gallagher:

For purposes of your audit and accounting, I hereby confirm on June 01, 2020 the following:

- My firm has been asked to serve as the escrow agent on behalf of Theia Group Inc., a Delaware C Corporation, and for each of the countries of the Master Partner Program ("MPP").

- The present amount of funds and/or funds equivalent in face value of US T-bills earmarked for escrow is $6,000,000,000.00.

- The aforementioned amount is composed of the MPP participation fees of 3 non-US governments. The names of the governments are confidential under the escrow, and disclosure requires the permission of said governments.

### *The December 4, 2020 Investor Presentation*

53.    Encouraged by the June 17, 2020 meeting, Associate 2 reached out to the CEO of Wealth Management Company 1 for assistance in recruiting investors to Investment Group 1. In Associate 2's overture to Wealth Management Company 1, they mentioned that Theia had secured financing for the totality of the TSN through the MPP and already had a significant amount of the required capital in escrow.

54.    From August 2020 through December 2020, Wealth Management Company 1 began its own due diligence on Theia and made several visits to Theia's Washington, D.C.

headquarters. Throughout this process, Wealth Management Company 1 also began to reach out to their network of clients about investing in Theia through Investment Group 1. This process culminated in a December 4, 2020 virtual investor presentation by **OLSON, BUSCHER, FARGNOLI**, and **SWATI** to representatives of Wealth Management Company 1 and to potential investors in Investment Group 1. By this time, **SWATI** was both an organizer of Investment Group 1 and Theia's Head of Strategic Investment. **OLSON** and **FARGNOLI** were in Washington, D.C. at the time of this presentation, while many of the attendees were spread out around the country and the world.

55.     On the call, which was recorded, **OLSON** repeated the misrepresentation that Theia had received $6 billion from MPP nations and had it set aside. **OLSON** also presented a slide stating that Theia was already producing income from U.S. government contracts and commercial clients, neither of which was true.

56.     Also, during the presentation, **FARGNOLI** discussed what Theia termed its "proven analytics" and presented the slide shown below. Specifically, **FARGNOLI** described business sectors where Theia's remote sensing technology had purportedly been successful using aircraft. In describing these sectors, **FARGNOLI** made multiple references to Theia's "customers," although they did not have any.

**PROVEN ANALYTICS (2)**  THEIA

**THEIA DECISION-GRADE® ANALYTICS AND M3® TECHNOLOGY IS EXTENSIVELY PROVEN FROM AIRCRAFT**

| | FUNCTION | KEY PROOF METRIC | EXTENT OF ACTIVITY/PROOF |
|---|---|---|---|
| PRECISION DIGITAL POLICING | CONTINUOUSLY CAPTURES ENTIRE EARTH WITHIN 0.2 TO 0.5 METER RESOLUTION, WITNESSING THE BEFORE AND AFTER OF EVERY CRIME OR ILLEGAL PHYSICAL EVENT ON GROUND | 94% SUCCESS | DIGITAL POLICING USING WIDE AREA MOTION IMAGERY TECHNOLOGY OVER 19 MAJOR CITIES IN 3 COUNTRIES, DIRECTLY TRACKING THE PERPETRATORS OF PHYSICAL CRIMES 94% OF THE TIME, SINCE 2009 |
| INFRASTRUCTURE ASSURANCE | IDENTIFICATION AND GRADING OF ANOMALIES OR WEAKNESS IN PIPELINES, ROADS, BRIDGES, RAILWAY, AND VARIOUS TYPES OF FACTORIES | 97% CORRECT | OVER 2900 BUILDINGS AND INFRASTRUCTURE ELEMENTS TRACKED AND GRADED OVER A PERIOD OF 5 YEARS, WITH SELECTED COMPARISONS TO GROUND-TRUTH EXAM |
| NATURAL CATASTROPHE MAPPING & PHYSICAL INSURANCE | MAPPING OF DAMAGE TO BUILDINGS, INFRASTRUCTURE, INCLUDING UTILITIES IN ORDER TO PRIORITIZE REPAIRS AND INSURANCE SETTLEMENTS | 94% CORRECT | 14 MAJOR NATURAL DISASTERS COVERED; 7,000 CLAIMS PAID BASED ON THEIA RESULTS OF REMOTE SENSING BASED EVALUATION OF DAMAGE |
| PRECISION SURVEYING FROM OVERHEAD | PROVIDES 10 CM ACCURATE SURVEY OF PROPERTY CORNERS AND BOUNDARIES FROM OVERHEAD, USING DUAL BAND INSAR RADAR TECHNIQUE, COVERING 1000'S OF PROPERTIES PER DAY | 99.73% CORRECT | THEIA HAS USED ITS PATENT-PENDING TECHNIQUE TO LOCATE 792 PROPERTY CORNERS TO 10 CM ACCURACY FROM AIRCRAFT, WITH RANDOM SAMPLE CHECKED BY GROUND SURVEY |
| ILLEGAL FISHING & SMUGGLING ACTIVITY AT SEA | DETECTS AND ALERTS BASED ON 20 METRICS ASSOCIATED WITH BEHAVIOR OF SHIPS AND VESSELS IN EEZ | 86% CORRECT | 86% OF IDENTIFIED CASES THAT WERE CHECKED BY COAST GUARD OR OTHER AUTHORITIES RESULTED IN DETERMINATION OF ILLEGAL GOODS OR FISHING |
| BURIED OBJECT DETECTION | MAPS PROBABILITY OF BURIED OBJECTS TO APPROXIMATELY 20 METERS | 94% SUCCESS | 94 out of 100 FINDS IN MULTIPLE TRIALS IN FOREIGN COUNTRIES FOR BURIED IEDS, UXO, WEAPONS GEO-CACHE |

**THEIA'S TEAM HAS OVER 29,000 HOURS OF REMOTE SENSING FLIGHT TIME OVER PAST 19 YEARS**
**TSN SENSORS CAPTURE THE SAME DATA TYPES, QUALITY & RESOLUTION AS THEIA'S AIRCRAFT**
©2020 THEIA   BUSINESS CONFIDENTIAL AND PROPRIETARY   DO NOT COPY OR DISTRIBUTE
23

57.    **FARGNOLI** also discussed the ability of Theia's technology to track perpetrators of crimes and "closing cases." **FARGNOLI** falsely described this as something "we're proving from aircraft and we're now moving to space."

58.    With regard to the insurance sector, **FARGNOLI** described the ability of Theia's technology to assist insurance companies in evaluating claims. **FARGNOLI** stated, "We are doing this on a daily basis literally right now with insurance companies validating this." **FARGNOLI** went on to falsely describe 7,000 claims paid based on Theia's data in 14 major natural disasters.

59.    Wealth Management Company 1 and their clients in attendance were impressed by the presentation, which helped generate great interest in subscribing to an investment in Theia through Investment Group 1.

*The Procurement of Certified Financial Statements*

60.    Beginning in September 2020, and as a pre-condition of Investment Group 1's investment, Wealth Management Company 1 asked for audited or certified financial statements

17

for Theia. On December 8, 2020, Accounting Firm 1 issued an audit opinion for Theia's 2019 financial statements. The audited financials showed that 2019 resulted in a net loss of more than $94 million for Theia and that Theia had no revenue. It also made no mention of Theia holding $6 billion in escrow or Theia having definitive MPP agreements. The accompanying notes further described management's doubt that Theia would remain in business for the next twelve months: "We have therefore concluded there is substantial doubt about our ability to continue as a going concern through December 8, 2021."

61.     On December 9, 2020, **OLSON** and **GALLAGHER** received Accounting Firm 1's audited financials via email. On December 15, 2020, **OLSON** forwarded the financials to **SWATI** and **BUSCHER**, calling them an "absolute disaster." **OLSON** claimed that he would attempt to get them "corrected" by Accounting Firm 1 but that he could not do so in advance of the closing of Investment Group 1's investment. **SWATI** responded, "Hmmm…yeah. This may not be helpful."

62.     **OLSON** and **BUSCHER** went in search of an accountant to certify a false balance sheet that fraudulently included $6 billion in deposits. On December 16, 2020, **BUSCHER** and **OLSON** had an exchange via an encrypted messaging application. **BUSCHER** told **OLSON** that he was "hitting up every former [Accounting Firm 2] Russian we know. One of them will do it for the $$$[.]" **OLSON** then joked, "Maybe we put an advert in eBay. $100k out to fetch us a CPA…." Interpreting this as a serious suggestion, **BUSCHER** responded, "[L]et me think about it. Man if it's ever exposed that we went trolling on eBay for the letter in exchange for cash it just isn't as elegant as your new CFO went searching among his existing [Accounting Firm 2] contacts." **OLSON** responded, "OMG I was totally joking dude…."

63.     On December 16, 2020, **BUSCHER** reached out to Accountant 1—a Cyprus-based accountant—by text message, stating "I'm CFO of a large American company in Washington, DC that needs to find a reliable accounting specialist. How are you doing? Is there a chance you would take a consulting contract, either full time or part time?"

64.     That same day, **BUSCHER** emailed Accountant 1 an income statement showing $13,410,000 in actual 2019 income and $21,741,386 in 2020 income, both of which were false as Theia had no income in 2019 or 2020. **BUSCHER** also included a balance sheet, which falsely and fraudulently contained the $6 billion in escrow deposits. **BUSCHER** stated in the email that he was "interested to have your quick view as to whether or not we are applying IFRS [International Financial Reporting] standards correctly and can offer to pay you $25,000 to help us review it so that I could show it to my board of directors. . . . We are NOT looking for any sort of confirmatory audit work at this point, just an understanding if we are applying proper IFRS standards overall."

65.     In exchange for $25,000, Accountant 1 agreed to assist. On December 18, 2020, Accountant 1 had a call with **OLSON** and **BUSCHER**, who were in Washington, D.C., to discuss the matter further. On December 18, 2020, Accountant 1 sent **BUSCHER** a signed letter certifying the fraudulent financial statements **BUSCHER** had provided and which were attached.

66.     **BUSCHER** forwarded the letter to **OLSON**, who responded, "OMG YOU'VE GOT IT!!! This will be so useful as well for other matters my friend…. [EXPLETIVE] YEAH!!!"

67.     Without consulting Accountant 1 and with the knowledge of **SWATI** and **BUSCHER**, **OLSON** made changes to the balance sheet attached to the letter. Most notably, **OLSON** moved debt Theia owed from a current liability—meaning it was due within a year—to a long-term liability.

68.    Despite organizing Investment Group 1 and knowing the investors' interests in receiving audited financials, **SWATI** never provided Accounting Firm 1's audited financials or opinion to Investment Group 1. Instead, on December 21, 2020, **SWATI** emailed Associate 2 and the CEO of Wealth Management Company 1 Accountant 1's letter and balance sheet and stated, "[P]lease find attached the Theia management accounts as certified by an IFRS accountant and as provided to me by Erlend [**OLSON**] and Steve [**BUSCHER**]."

69.    Based on the escrow letter, the representations by **OLSON** and **FARGNOLI**, and the certification of the false financials obtained by **BUSCHER** and transmitted by **SWATI**, Theia received $24,593,100 from Investment Group 1 in exchange for a convertible promissory note on January 13, 2021. Those funds went into a Theia account, described in more detail in paragraphs 82 and 83, that previously had a balance of $211,107.85. Following receipt of the Investment Group 1's investment, **BUSCHER** initiated the following wire transfers from that account:

| DATE | AMOUNT | RECIPIENT |
|---|---|---|
| January 14, 2021 | $614,827.15 | **OLSON**'s personal account |
| January 14, 2021 | $614,827.15 | **SWATI**'s personal account |
| January 14, 2021 | $122,965.50 | **BUSCHER**'s personal account |
| January 22, 2021 | $150,000 | Entity controlled by **GALLAGHER** |
| February 1, 2021 | $100,000 | **OLSON**'s personal account |
| February 1, 2021 | $97,788 | Entity Controlled by **FARGNOLI** |
| February 11, 2021 | $850,000 | Entity controlled by **GALLAGHER** |

## Fraudulent Solicitation of Investment from Institutional Investor 1

70.    On October 4, 2018, Institutional Investor 1 loaned $20 million to Theia. On August 7, 2019, Institutional Investor 1 made an additional loan to Theia for slightly less than $5 million.

Shortly thereafter, Theia began seeking a much larger loan from Institutional Investor 1 in excess of $100 million.

71.     On January 9, 2020, the president of Institutional Investor 1 visited Theia's headquarters in Washington, D.C. for a meeting with **GALLAGHER** and others. **GALLAGHER** was the primary contact for Institutional Investor 1. Theia representatives told the president of Institutional Investor 1 that Theia's aircraft was completed and would be ready for deployment in the coming months on a contract with the U.S. government purportedly paying $22,000 and $55,000 per flight hour. Additionally, **GALLAGHER** provided the president of Institutional Investor 1 with an update on the MPP. **GALLAGHER** informed the president of Institutional Investor 1 that Theia anticipated receiving some MPP money in the near future but made no mention of any escrowed funds. Of note, this meeting was the same date as the first meeting at Theia's headquarters with Attorney 1 about obtaining the fake escrow letter confirming Theia had $6 billion in escrow.

72.     On March 26, 2020, **GALLAGHER** sent Institutional Investor 1 via Associate 3 a document titled "Common Q&A." The document was another version of the Q&A created for Investor 4. Notably, the Common Q&A sent to Institutional Investor 1 removed all references to Theia reportedly having $6 billion in escrow and $3.8 million in net cash flow per month from government contracts. Instead, the Common Q&A claimed revenue was forthcoming from a then-existing government contract. The Common Q&A also attached what was titled "Redacted and Shortened Contract with [Country 1]," which was a purported MPP contract.

73.     In actuality, in February 2020, Theia signed an MPP memorandum of agreement with a trust based in Country 1 (the "Trust") but with no affiliation to the government of Country 1. The Trust claimed it would pay Theia a total of $2 billion for use of data from the TSN and

Theia aircraft. In obtaining the agreement with the Trust, **OLSON** and **GALLAGHER** claimed that Theia had $6 billion already in escrow from other MPP counterparties, which was made a warranty of the agreement. Additionally, the Trust agreed to pay an initial $200 million after receiving certification of the $6 billion in escrow. The version of the agreement with the Trust sent to Institutional Investor 1 redacted the name of the counterparty and all references to the $6 billion Theia claimed to the Trust to have in escrow from other MPP counterparties. However, Theia did not redact the portion of the agreement related to the $200 million initial payment.

74.     In April 2020, Institutional Investor 1 received a document from Theia entitled "The Sky is Not the Limit" with additional references to government contracts and to the fabricated MPP agreement with Country 1. Specifically, it falsely stated, "THEIA has been asked to deploy aircraft in support of US programs, through an existing funded open rec program which falls under a native American-owned company." Additionally, the document claimed that there was a trust set up by the government of Country 1, which had entered into a definitive contract with Theia. The document went on to say that the initial payment of $200 million from the trust set up by the government of Country 1 to Theia would be made before August 1, 2020, and that these funds would be unconstrained.

75.     Institutional Investor 1 sought additional due diligence on Theia's contract that purportedly would be producing revenue in the near term. In April 2020, **OLSON** sought to obtain a letter that would satisfy Institutional Investor 1's questions. Theia had recently engaged Consultant 1 to assist the company in identifying government relationships and opportunities. **OLSON** drafted a letter with **GALLAGHER**'s approval addressed to **GALLAGHER** as a member of Theia's board and supposedly from an official at Government Contractor 1 ("GC1

Letter"). The GC1 Letter falsely outlined a subcontracting relationship between Theia and Government Contractor 1. The letter went through many revisions.

76.     On April 30, 2020, **OLSON** emailed the latest draft of the GC1 Letter to Consultant 1 and asked for assistance in getting the letter signed by Government Contractor 1. On May 6, 2020, Consultant 1 sent a revised draft of the letter to **OLSON, GALLAGHER**, and others. **OLSON** responded with another new draft, stating he wanted the letter to sound less like a "'sales call' letter and more like an 'we're doing this' letter." The GC1 Letter included specific references to a subcontracting relationship between Theia and Government Contractor 1. It further described a purported specific U.S. government contract involving a required aircraft model and stated Theia would be paid up to $54,000 per hour. The letter also described the minimum work of Theia under the contract as 960 hours with a proposed average of 1440 hours per year. In reality, there was no subcontracting relationship between Theia and Government Contractor 1 and no specific contracting opportunity had been identified. Instead, the numbers were taken directly from **OLSON**'s initial draft.

77.     On May 7, 2020, **GALLAGHER** sent that false and fraudulent version of the draft GC1 Letter in an email to Institutional Investor 1 through Associate 3.

78.     On May 14, 2020, the GC1 Letter was signed by the CEO of Government Contractor 1 and sent to **OLSON, GALLAGHER**, and others. This signed version of the GC1 Letter was also false and fraudulent.

79.     On May 27, 2020, Associate 3 sent the GC1 Letter to Institutional Investor 1 via email. On June 29, 2020, Institutional Investor 1 agreed to lend approximately $200 million in exchange for two $100 million promissory notes with Theia. Thereafter, a portion of the new loan was used to satisfy the prior loans by Institutional Investor 1; the new notes were secured, in part,

by Theia's purported U.S. Government receivables. In funding the June 2020 loan, Institutional Investor 1 specifically relied on the contract described in the false and fraudulent letter from Government Contractor 1 (that is, one version of the GC1 Letter), as well as the agreement entitling Theia to $200 million from the Trust as primary sources of repayment and significant mitigators of its risk. Institutional Investor 1 was unaware that Theia had secured the agreement of the Trust from Country 1 with false claims of $6 billion in escrow.

80.    Within one week of the deposit of the money from Institutional Investor 1, **OLSON** received $1.8 million from Theia via MVC, and **GALLAGHER** received $4.815 million from Theia through entities and accounts he controlled.

81.    Based on Theia's representations, Institutional Investor 1's loan contained certain conditions. For one, a significant portion of the funding was to be used to purchase and equip the aircraft necessary for the contracts described in the letter from Government Contractor 1. Additionally, Institutional Investor 1 instituted stringent controls over Theia's spending, required visibility into Theia's bank accounts, and created requirements related to any new indebtedness by Theia.

82.    In order to circumvent Institutional Investor 1's visibility into and controls over Theia's finances, **BUSCHER** and **OLSON** agreed to open a new account at Bank 2 without Institutional Investor 1's knowledge. On December 3, 2020, **BUSCHER** and **OLSON** filled out the necessary paperwork to open a new account in Theia's name at Bank 2 (the "New Account"). On the signature card form, **BUSCHER** listed **BUSCHER** and **OLSON** as the only authorized signatories on the New Account. On a form entitled "Certification Regarding Beneficial Owners of Legal Entity Customers," **BUSCHER** listed **OLSON** as the 67% owner of Theia. On December

3, 2020, **BUSCHER** emailed these forms from Washington, D.C. to a representative of Bank 2. Shortly thereafter, the New Account was open.

83.      From December 2020 to June 2021, **OLSON** and **BUSCHER** caused additional funding, including the money from Investors 7 and 8 and Investment Group 1, to be deposited into the New Account. Out of the initial $1.1 million in investor funds deposited into the account between December 9 and December 11, 2020, **OLSON** and **BUSCHER** caused $202,937.96 to be wired to **BUSCHER**, $100,000 to be wired to **OLSON**, and $124,740 to be wired to **FARGNOLI**, in violation of the budgets approved by Institutional Investor 1 in their negotiations with Theia.

84.      On June 29, 2021, the balance on Theia's notes with Institutional Investor 1 came due, and Theia failed to pay. On July 22, 2021, Institutional Investor 1 provided Theia with formal notice that it was in default. Institutional Investor 1 sued Theia, and on October 29, 2021, Theia was ordered into receivership.  The vast majority of F&F Investors were unpaid at that time and remain unpaid. From the date of the default until Theia was ordered into receivership, **OLSON** and others continued to solicit investment in Theia using misrepresentations and failing to disclose that Theia was in default with Institutional Investor 1.

<u>**COUNT ONE**</u>
**(Conspiracy to Commit Wire Fraud and Mail Fraud)**

85.      Paragraphs 1 through 84 are incorporated here by reference.

86.      From at least February 3, 2017, and continuing until at least October 29, 2021, in the District of Columbia and elsewhere, the defendants,

**ERLEND OLSON,**
**JOHN J. GALLAGHER,**
**STEPHEN BUSCHER,**
**JOSEPH FARGNOLI**, and
**JAMIL SWATI,**

25

and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others to commit the offenses of wire fraud and mail fraud, that is, to knowingly, and with the intent to defraud, devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and, for the purpose of executing the scheme and artifice, (a) to knowingly and intentionally transmit and cause to be transmitted writings, signs, signals, pictures, and sounds, by means of wire communications in interstate commerce, in violation of Title 18, United States Code, Section 1343, and (b) to knowingly take and receive from an authorized depository for mail any matter or thing, knowingly cause to be delivered by private and commercial interstate carrier any matter or thing, and deposit and cause to be deposited any matter or thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Section 1341.

## OBJECT OF THE CONSPIRACY

87.    It was the object of the conspiracy for **OLSON, GALLAGHER, BUSCHER, FARGNOLI, SWATI**, and others known and unknown to the Grand Jury, to obtain money and to personally enrich themselves by making false and fraudulent material misrepresentations to investors to induce and encourage them to make and maintain investments in Theia.

## MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

88.    The manner by which **OLSON, GALLAGHER, BUSCHER, FARGNOLI, SWATI**, and others known and unknown to the Grand Jury, sought to accomplish the objects of the conspiracy included, among other things, the following:

   a) Misrepresenting Theia's financial position, including Theia's cash-on-hand, income, and money set aside in escrow;

b) Misrepresenting that Theia had revenue-producing contracts with the United States and foreign governments;

c) Misrepresenting that Theia had commercial clients and what Theia's technology had accomplished on behalf of those clients;

d) Falsifying bank statements, balance sheets, and other financial documents to be shown to potential investors;

e) Concealing true bank statements, balance sheets, and other financial documents, such as audit opinions and audited financial statements;

f) Misrepresenting progress in the MPP, including what sovereign nations had signed on to the program and what financial commitments they had made; and

g) Misrepresenting to investors the status of Theia's aircraft program, including the number of flights taken, the amount of data collected, and how that data had been used and analyzed.

**(Conspiracy to Commit Wire and Mail Fraud, in violation of Title 18, United States Code, Section 1349)**

## COUNTS TWO THROUGH SIX
**(Wire Fraud)**

89.    Paragraphs 1 through 84 and 88 are realleged.

90.    From at least February 3, 2017, and continuing until at least October 29, 2021, in the District of Columbia and elsewhere, the defendants,

**ERLEND OLSON,
JOHN J. GALLAGHER,
STEPHEN BUSCHER,
JOSEPH FARGNOLI, and
JAMIL SWATI,**

27

and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money by means of material false and fraudulent pretenses, representations, and promises; specifically, the defendants sought to obtain money and to personally enrich themselves by making false and fraudulent material misrepresentations to investors to induce and encourage them to make and maintain investments in Theia.

91.    On or about the dates set forth below, in the District of Columbia and elsewhere, the listed defendants, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly and intentionally transmitted and caused to be transmitted writings, signs, signals, pictures, and sounds, by means of the following wire communications in interstate commerce:

| Count | Defendant(s) | Approximate Date | Description |
|---|---|---|---|
| 2 | **OLSON GALLAGHER** | April 20, 2020 | $2 million interstate wire transfer from Investor 5 in Washington, D.C. to Theia's bank account with Bank 1. |
| 3 | **OLSON GALLAGHER** | December 1, 2020 | Email from **OLSON** in Washington, D.C. to Investor 7, outside of Washington, D.C., encouraging Investor 7 to come to Theia's office to verify the $6 billion Theia purportedly had in escrow. |
| 4 | **OLSON GALLAGHER BUSCHER** | December 3, 2020 | Email from **BUSCHER** to a representative of Bank 2 with the required forms to open the New Account. |
| 5 | **OLSON GALLAGHER BUSCHER FARGNOLI** | December 4, 2020 | Virtual investor presentation for Wealth Management Company 1 and investors in Investment Group 1. |
| 6 | **OLSON GALLAGHER BUSCHER FARGNOLI SWATI** | December 18, 2020 | Call from **OLSON** and **BUSCHER** in Washington, D.C. to Accountant 1 in Cyprus to obtain certification of false financial statements for Investment Group 1. |

**(Wire Fraud, Aiding and Abetting and Causing an Act to Be Done,
in violation of Title 18, United States Code, Sections 1343 and 2)**

### COUNT SEVEN
**(Mail Fraud)**

92.    Paragraphs 1 through 84, and 88 are incorporated here by reference.

93.    On or about the dates set forth below, in the District of Columbia and elsewhere,

defendants

**ERLEND OLSON** and
**JOHN J. GALLAGHER,**

having knowingly devised and intended to devise the aforementioned scheme and artifice to

defraud and to obtain money by means of material false and fraudulent pretenses, representations,

and promises, for the purpose of executing and attempting to execute said scheme and artifice,

knowingly placed and caused to be placed in a post office and authorized depository for mail

matter the following matters and things to be sent and delivered by the Postal Service, and

knowingly deposited and caused to be deposited such matters and things to be sent and delivered

by private and commercial interstate carrier, and knowingly delivered and caused to be delivered

by mail and such carriers according to the direction thereon, and at the place at which it is directed

to be delivered by the person to whom it is addressed, such matters and things:

| Count | Defendant(s) | Approximate Date | Description |
|-------|-------------|------------------|-------------|
| 7 | OLSON GALLAGHER | June 16, 2020 | Shipping of the signed updated escrow letter from New Jersey to GALLAGHER at Theia's headquarters in Washington, D.C. by Attorney 1 |

**(Mail Fraud, Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Sections 1341 and 2)**

## Background on Tax Charges

94.    The Internal Revenue Service ("IRS") was an agency of the United States

Department of the Treasury responsible for administering the tax laws of the United States and

collecting taxes owed to the United States.

95.    An IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040"), is used by

U.S. taxpayers to file an annual income tax return, which is typically due on April 15 of the

calendar year following the tax year. Taxpayers are required to pay any taxes owed on or before

the due date of the return, regardless of whether they file a return on that date.

96. As detailed below, **OLSON** engaged in a multi-year scheme to evade at least $573,912.75 in assessed federal taxes (including credits) and $626,533.78 in assessed penalties and interest he owed for tax years 2009 through 2011. He also failed to file income tax returns, failed to report $6,724,309.85 in taxable income, and evaded $2,383,099 in tax due and owing for the years 2018 through 2020, as follows:

| TAX YEAR | UNREPORTED TAXABLE INCOME | TAX DUE AND OWING |
|---|---|---|
| 2018 | $2,355,633.56 | $837,274 |
| 2019 | $1,184,092.50 | $403,102 |
| 2020 | $3,184,583.79 | $1,142,723 |
| TOTAL | $6,724,309.85 | $2,383,099 |

## COUNT EIGHT
### (Evasion of Payment—Tax Years 2009-2011)

97. Paragraphs 1 through 84 and 94 through 96 are incorporated here by reference.

### The Examination of OLSON's 2009 through 2011 Tax Returns

98. **OLSON** filed a federal income tax return for tax year 2009 on November 1, 2010. **OLSON** did not make any tax payments for the 2009 tax year, including estimated tax payments prior to filing or any payments with or after filing.

99. On May 15, 2012, **OLSON** applied to participate in the IRS's Offshore Voluntary Disclosure Program ("OVDP"), related to offshore bank accounts that he failed to disclose to the Department of Treasury in previous years as required. Applicants to OVDP were required to, among other things, file any delinquent tax returns for the previous eight years.

100. **OLSON** filed a delinquent federal income tax return for tax year 2010 on June 21, 2012, pursuant to the requirements of the OVDP. **OLSON** reported a tax liability of zero on that return.

101.    As part of the OVDP process, **OLSON** filed a delinquent federal income tax return for tax year 2011 on September 4, 2013.  **OLSON** reported a tax liability of $2,995 on that return, which was offset by a claimed child tax credit.

102.    In January 2014, as part of the OVDP process, the IRS began an examination of **OLSON**'s 2009 through 2011 federal income tax returns.

103.    In August 2014, **OLSON** was rejected from the OVDP due to lack of compliance with the OVDP's requirements. The IRS continued its examination of **OLSON**'s 2009 through 2011 tax returns.  As a result of the examination, in 2016, the IRS assessed **OLSON** the following tax liabilities, penalties and interest on those years:

| TAX YEAR | TAXES DUE (INCLUDES CREDITS) | ASSESSED INTEREST | ASSESSED PENALTY | TOTAL |
|---|---|---|---|---|
| **2009** | $419,534.00 | $223,975.60 | $208,411.35 | $851,920.95 |
| **2010** | $126,723.75 | $70,272.41 | $92,167.20 | $289,163.36 |
| **2011** | $27,655.00 | $12,947.72 | $18,759.50 | $59,362.22 |
| **TOTAL** | $573,912.75 | $307,195.73 | $319,338.05 | $1,200,446.53 |

104.    In 2018, **OLSON** acknowledged his tax debt of approximately $1.2 million. However, notwithstanding this knowledge and despite earning millions during his tenure at Theia, **OLSON** did not remit and has not remitted payment for tax years 2009, 2010, or 2011. As of March 3, 2025, accruing interest has increased the amount **OLSON** owes for tax years 2009 to 2011 to $1,606,029.

### Use of MVC to Conceal OLSON's Assets and Income from the IRS

105.    In December 2015, MVC was created as a holding company for **OLSON**'s, and later **GALLAGHER**'s, ownership interests in Theia. When MVC was initially formed, **OLSON** was MVC's president, chairman of the board, and sole shareholder. However, **OLSON** and **GALLAGHER** renegotiated their MVC ownership and roles multiple times.

106.    **OLSON** and **GALLAGHER** controlled MVC, and Individual 1 handled many of its administrative operations. Starting in December 2017 and continuing through December 2020, **OLSON**, with the assistance of **GALLAGHER** and Individual 1, used MVC as a vehicle to receive **OLSON's** compensation from his work for Theia, thereby concealing from the IRS millions of dollars of assets and income that **OLSON** received from Theia. **OLSON** and **GALLAGHER** never filed a corporate income tax return for MVC.

107.    From in or about January 2018 through December 2020, **OLSON** received more than $6 million in cash from Theia paid through MVC's bank account including:

    a)  $1,210,000 for two condominiums in Las Vegas for personal use;

    b)  $292,080 for a private jet membership that **OLSON** put to personal use;

    c)  $713,752.50 to satisfy **OLSON**'s child support debt, paid through a bank account of **GALLAGHER**'s law firm;

    d)  $89,626.50 to satisfy the penalty **OLSON** incurred for failing to file a Report of Foreign Bank and Financial Accounts ("FBAR");

    e)  $193,500 in rent payments for **OLSON**'s residence in New Mexico, leased in the name of MVC;

    f)  $130,684.81 for a new Land Rover for **OLSON** that was not a company car; and

g) multiple other items worth tens of thousands of dollars for **OLSON**'s personal use.

108. None of the income that **OLSON** received from 2018 through 2020 was reported to the IRS as required by law.

109. OLSON also made false and misleading statements to an Assistant United States Attorney that he lacked financial means to pay the IRS his FBAR penalty and that money he had used to pay another debt was obtained by a loan.

110. Beginning at least as early as January 2018 through the date of this indictment, in the District of Columbia and elsewhere, defendant

**ERLEND OLSON,**

a resident of Albuquerque, New Mexico, willfully attempted to evade and defeat the payment of income tax due and owing by him to the United States of America, for the calendar years 2009, 2010, and 2011, by committing the following affirmative acts of evasion, among others:

a) Causing compensation from Theia to be paid to a bank account held in the name of MVC;

b) Paying and causing to be paid personal expenses out of the MVC bank account;

c) Leasing his New Mexico residence in the name of MVC;

d) Purchasing assets through and in the names of nominees;

e) Directing that his pay and bonuses not be reported to the IRS; and

f) Structuring transactions to avoid reporting to the IRS.

**(Evasion of Payment, in violation of Title 26, United States Code, Section 7201)**

## COUNT NINE
### (Tax Evasion —2018)

111.    The allegations in paragraphs 1 through 84, 94 through 96, and 105 through 109 are incorporated here by reference.

112.    During the calendar year 2018, defendant

**ERLEND OLSON,**

a resident of Albuquerque, New Mexico, received taxable income, upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before April 15, 2019, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, **OLSON**, from January 2018 through the date of the indictment, in the District of Columbia and elsewhere, willfully attempted to evade and defeat substantial income tax due and owing by him to the United States of America, for the calendar year 2018, by committing the following affirmative acts, among others:

    a)  Causing compensation from Theia to be paid to a bank account held in the name of MVC;

    b)  Paying and causing to be paid personal expenses out of the MVC bank account;

    c)  Leasing his New Mexico residence in the name of MVC;

    d)  Purchasing assets through and in the names of nominees;

    e)  Directing that his pay and bonuses not be reported to the IRS; and

    f)  Structuring transactions to avoid reporting to the IRS.

**(Tax Evasion, in violation of Title 26, United States Code, Section 7201)**

## COUNT TEN
### (Tax Evasion —2019)

113.    The allegations in paragraphs 1 through 84, 94 through 96, and 105 through 109 are incorporated here by reference.

114.    During the calendar year 2019, defendant

**ERLEND OLSON,**

a resident of Albuquerque, New Mexico, received taxable income, upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before July 15, 2020, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, **OLSON,** from January 2019 through the date of the indictment, in the District of Columbia and elsewhere, willfully attempted to evade and defeat substantial income tax due and owing by him to the United States of America, for the calendar year 2019, by committing the following affirmative acts, among others:

a)  Causing compensation from Theia to be paid to a bank account held in the name of MVC;

b)  Paying and causing to be paid personal expenses out of the MVC bank account;

c)  Leasing his New Mexico residence in the name of MVC;

d)  Purchasing assets through and in the names of nominees;

e)  Directing that his pay and bonuses not be reported to the IRS; and

f)  Structuring transactions to avoid reporting to the IRS.

**(Tax Evasion, in violation of Title 26, United States Code, Section 7201)**

## COUNT ELEVEN
### (Tax Evasion —2020)

115.    The allegations in paragraphs 1 through 84, 94 through 96, and 105 through 109 are incorporated here by reference.

116.    During the calendar year 2020, defendant

### ERLEND OLSON,

a resident of Albuquerque, New Mexico, received taxable income, upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before May 17, 2021, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, **OLSON**, from January 2020 through the date of the indictment, in the District of Columbia and elsewhere, willfully attempted to evade and defeat substantial income tax due and owing by him to the United States of America, for the calendar year 2020, by committing the following affirmative acts, among others:

   a) Causing compensation from Theia to be paid to a bank account held in the name of MVC;

   b) Paying and causing to be paid personal expenses out of the MVC bank account;

   c) Leasing his New Mexico residence in the name of MVC;

   d) Purchasing assets through and in the names of nominees;

   e) Directing that his pay and bonuses not to be reported to the IRS; and

   f) Structuring transactions to avoid reporting to the IRS.

### (Tax Evasion, in violation of Title 26, United States Code, Section 7201)

## FORFEITURE ALLEGATION

117.    Upon conviction of any of the offenses alleged in Counts One through Seven, the defendant convicted of such offense shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States also will seek a forfeiture money judgment against the defendant in an amount equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

118.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

A TRUE BILL

_____

Grand Jury Foreperson

38

By

_Edward R. Martin Jr. bm_
EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY IN AND FOR
THE DISTRICT OF COLUMBIA

By

KAREN E. KELLY
ACTING DEPUTY ASSISTANT ATTORNEY GENERAL, TAX DIVISION
DEPARTMENT OF JUSTICE

39

EXHIBIT 2

JA381770
SOURCE

**Jaguar Land Rover Albuquerque**
5010 Alameda Blvd NE
Albuquerque NM 87113
(505) 797-3600

Land Rover Santa Fe
2582 Camino Entrada
Santa Fe NM 87507
(505) 474-0888
Fax (505) 474-0142

DEAL # 738

CUSTOMER NAME ERLEND OLSON

SALESMAN
DATE 04/02/2018
BUS PHONE
RES PHONE (949) 630 5758

| NEW ☒☒ USED ☐ COLOR 1AA/FUJI WHITE | TRIM | | | | APPROX DEL DATE 04/02/2018 | R O S NO | |
|---|---|---|---|---|---|---|---|
| YEAR | CYL | MAKE LANDROVER | MODEL RANGE ROVER | I D NO SALGS5REXJA381770 | LICENSE NO | | MOTOR VEHICLE |
| 18 | 8 | ODOMETER READING 106 | TYPE MP | KEY NO | | TAB NO | $ 123961.00 |

FILL OUT THIS SECTION IF USED CAR IS TO BE TRADED IN

YEAR N/A _____ MAKE N/A _____ MODEL N/A

ID NO N/A _____ LIC NO N/A

ODOMETER READING N/A _____ TAB NO _____

BALANCE OWED TO _____ N/A _____ BY _____

ADDRESS _____

**WARRANTY INFORMATION**

—— (Buyer initials) **NEW VEHICLES AND DEMONSTRATORS** THIS VEHICLE IS SOLD WITH A MANUFACTURER'S LIMITED WARRANTY "THE MANUFACTURER'S LIMITED WARRANTY IS BUYER'S EXCLUSIVE REMEDY FOR ANY DEFECTS IN THE VEHICLE DEALER MAY PERFORM REPAIRS UNDER THE MANUFACTURER'S LIMITED WARRANTY, BUT DEALER IS NOT RESPONSIBLE FOR THE **MANUFACTURER'S LIMITED WARRANTY** OR FOR ANY IMPLIED WARRANTIES MADE BY THE MANUFACTURER DEALER MAKES NO WARRANTY ON THIS VEHICLE AND DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IF ANY WARRANTY IS DEEMED TO HAVE BEEN MADE BY DEALER, OR IF THIS VEHICLE IS SOLD WITH A SERVICE CONTRACT, THE TERMS OF ANY SUCH WARRANTY OR SERVICE CONTRACT ARE AS PROVIDED THEREIN, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE LIMITED TO THE DURATION OF SUCH WARRANTY OR SERVICE CONTRACT, AND BUYER'S EXCLUSIVE REMEDY IS REPAIR OR REPLACEMENT OF DEFECTIVE PARTS BY DEALER

—— (Buyer initials) **USED VEHICLES** *"NEW MEXICO LAW REQUIRES THAT THIS VEHICLE WILL BE FIT FOR THE ORDINARY PURPOSES FOR WHICH THE VEHICLE IS USED FOR FIFTEEN DAYS OR FIVE HUNDRED MILES AFTER DELIVERY, WHICHEVER IS EARLIER, EXCEPT WITH REGARD TO PARTICULAR DEFECTS DISCLOSED ON THE FIRST PAGE OF THIS AGREEMENT YOU (THE CONSUMER) WILL HAVE TO PAY UP TO TWENTY-FIVE DOLLARS ($25.00) FOR EACH OF THE FIRST TWO REPAIRS IF THE WARRANTY IS VIOLATED" THIS VEHICLE IS OTHERWISE SOLD **AS IS** (AFTER 15 DAYS OR 500 MILES), WITHOUT ANY FURTHER WARRANTY, EXPRESS OR IMPLIED, UNLESS A FURTHER WARRANTY IS GIVEN IN WRITING BY DEALER IF ANY FURTHER WARRANTY IS GIVEN IN WRITING BY DEALER, OR IF THIS VEHICLE IS SOLD WITH A SERVICE CONTRACT, THEN THE TERMS OF SUCH FURTHER WARRANTY OR SERVICE CONTRACT ARE AS PROVIDED THEREIN, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE LIMITED TO THE DURATION OF SUCH WRITTEN WARRANTY OR SERVICE CONTRACT, AND BUYER'S EXCLUSIVE REMEDY IS REPAIR OR REPLACEMENT OF DEFECTIVE PARTS BY DEALER

| | ON CAR | ADD TO | | |
|---|---|---|---|---|
| | | | | N/A |
| | | | | N/A |
| | | | | N/A |
| | | | CALTEX | 1134.00 |
| | | | | N/A |
| | | | | N/A |
| | | | LAND ROVER PPM | 1350.00 |
| | | | | N/A |

| | | | | TOTAL PRICE | $ 126445.00 |
|---|---|---|---|---|---|
| DOWN PAYMENT TRADE IN _____ | | (A) $ N/A | | | |
| LESS PAY OFF _____ | | (B) $ N/A | | | |
| TRADE IN (A LESS B) _____ | | (C) $ N/A | | | |
| REC # _____ CASH DOWN PAYMENT PREVIOUSLY PAID (D) | | $ _____ N/A | | | |
| REC # _____ CASH DOWN PAYMENT HEREWITH (E) | | $ _____ N/A | | | |
| REC # _____ DEFERRED CASH DOWN PAYMENT | | $ _____ N/A | | | |
| CASH DOWN PAYMENT (D E & F) _____ | | (G) $ _____ N/A | | | |
| | | TOTAL DOWN PAYMENT (TOTAL OF C & G) | | | $ N/A |
| | | | | | $ 126445.00 |
| LICENSE FEE | $ 65.00 | UNPAID BALANCE | | | $ 3923.81 |
| ADM FEE | $ 2.00 | SALES TAX | | | $ 67.00 |
| | | ESTIMATED DMV FEES | | | $ N/A |
| TOTAL DMV | $ 67.00 | DEALER TRANSFER SERVICE CHARGE | | | $ 249.00 |
| | | TOTAL DUE TO SELLER | | | $ 130684.81 |

USED VEHICLES ATTENTION CONSUMER Sign here only if the dealer has told you that this vehicle has the following problems and you agree to buy the vehicle on those terms

1. N/A        2. N/A        3. N/A

Consumer Signature N/A

ALL VEHICLES DEALER IS NOT LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS SALE OR THE USE OF THIS VEHICLE, INCLUDING BUT NOT LIMITED TO LOSS OF USE, LOSS OF TIME, INCONVENIENCE, TRANSPORTATION, RENTAL, LOSS OF EARNINGS OR PROFITS, OR ANY COMMERCIAL LOSS (This paragraph only applies after expiration of New Mexico's automatic 15-day/500-mile implied warranty in the case of used vehicles)

USED VEHICLES AND DEMONSTRATORS. THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THE CONTRACT INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE

Dealer states under oath that *to the best of Dealer's knowledge* there has been no alteration or **chassis repair** due to wreck damage on the vehicle being purchased, except as noted on this agreement

Buyer states under oath that *to the best of Buyer's knowledge* there has been no alteration or **chassis repair** due to wreck damage on the trade-in vehicle, except as noted on this agreement

**The full purchase price is due upon delivery.** This is a buyer's order agreement, not a credit agreement Dealer is not a lender Dealer may assist Buyer in obtaining third party financing, but Dealer is not responsible for obtaining financing Dealer does not guarantee credit approval Buyer grants Dealer a security interest in the vehicle being purchased under the Uniform Commercial Code to secure full payment Dealer has all rights and remedies of a secured party under the Uniform Commercial Code Buyer is not bound by credit terms until credit disclosures have been made Dealer may retain Buyer's deposit if Buyer fails to complete this purchase after the vehicle has been delivered or after this agreement becomes binding If this vehicle is delivered pending receipt of financing ("Spot Delivery"), Buyer must return the vehicle to Dealer immediately upon demand if financing fails for any reason

SPOT DELIVERY: Buyer has the right to void this purchase if financing is not approved within 20 calendar days after delivery of the vehicle. Buyer has the right to the return of any trade-in and all money paid by buyer, if buyer voids this contract under this paragraph. To exercise this right, buyer must return the vehicle to the dealer in the same condition as received (normal wear and tear excepted), within 48 hours of receipt of notice that financing was not approved. Dealer shall not charge any fees as long as the vehicle is returned as provided in this paragraph.

Buyer agrees to buy and Dealer agrees to sell this vehicle on the terms on both sides of this agreement. This agreement and any finance contract are an exclusive statement of the agreement between Buyer and Dealer, and cancel and supersede any oral or other agreement, promise or alleged representation concerning the vehicle and this purchase No modification of this agreement will be recognized unless made in writing and signed by Dealer This agreement is not binding on Dealer until signed by Dealer's authorized representative.

Buyer _____

Co-Buyer N/A _____

Dealer _____

| Certified Copy |
|---|
| By _____ |

The Reynolds and Reynolds Company   RO602500 Q  (07/17)

# EXHIBIT 3

| | |
|---|---|
| **From:** | Erlend Olson <erlendolson@yahoo.com> |
| **To:** | Makarewicz, Valerie (USACAC) |
| **Sent:** | 4/3/2018 3:45:25 AM |
| **Subject:** | Re: United States v. Olson |

Valerie,

I will contact you shortly, this week. FYI, I have been trying to work with the IRS to enter into a payment plan for this and other back taxes owed, and my case has been assigned to a local IRS office, but last I checked with that office (about 10 days ago), my case has not yet been assigned to an actual agent. Apparently because of the amount owed I have to work with an agent directly. So for avoidance of doubt, I am not trying to avoid payment, but I have no means to pay such an amount straight away (I owe the state of CA around $1.3M, the IRS around the same with the FBARs penalties below - I presently have a hardship agreement with the FTB and am paying them $800 per month).

-Erlend

---

**From:** "Makarewicz, Valerie (USACAC)" <Valerie.Makarewicz@usdoj.gov>
**To:** "erlendolson@yahoo.com" <erlendolson@yahoo.com>
**Sent:** Monday, April 2, 2018 5:13 PM
**Subject:** United States v. Olson

Mr. Olson,
I am an Assistant United States attorney in Los Angeles, California, and have been assigned to prosecute a matter against you regarding certain foreign accounts and FBAR penalties asserted by the Internal Revenue Service. On February 8, 2018, the United States of America filed a <u>COMPLAINT TO REDUCE FEDERAL PENALTY ASSESSMENTS TO JUDGMENT</u> against you in the Central District of California, which is attached, regarding these foreign accounts and the associated FBAR penalties. I would like to discuss this matter with you as soon as possible. Please contact me to discuss this matter.

Valerie Makarewicz
Assistant United States Attorney



CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by replying to this e-mail message. Please destroy the original transmission and its attachments without reading or saving in any manner.

EXHIBIT 4

**From:** Erlend Olson <erlendolson@yahoo.com>
**To:** ██████████████████████████ o██ ███████████████
**CC:**
**Sent:** 7/31/2020 12:43:30 AM
**Subject:** Re: POF: Ridges Homes and Condo
**Attachments:** JPM-Bank-Statement-0001_Redacted.pdf

## Attached.

On Thursday, July 30, 2020, 5:05:13 PM MDT, ███ o█ ███wrote:

I will defer to Erlend on the POF.
E, can you please reply?

Thank you,



Sent from my iPhone

On Jul 30, 2020, at 3:39 PM, ██████████████████ wrote:

Thanks J████! We just need proof of funds or financials to submit to the sellers to book the showings. What can I do to assist Ivan in procuring if any? We only have half a day left.



**CHASE** ◖

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

March 31, 2020 through April 30, 2020

Account Number: 0000003323▮

### Customer Service Information

If you have any questions about your
statement, please contact your
Customer Service Professional.



ERLEND M OLSON dba SMARTCO ENTERPRISES
1455 PENNSYLVANIA AVE SUITE 820
WASHINGTON DC 20004-1008

## Commercial Checking

### Summary

|  | Number | Market Value/Amount | Shares |
|---|---|---|---|
| Opening Ledger Balance |  | $13,654,131.11 |  |
| Deposits and Credits | 1 | $873,085.77 |  |
| Withdrawals and Debits | 3 | $3,667,902.25 |  |
| Checks Paid | 0 | $0.00 |  |
| **Ending Escrow Balance** |  | **$10,859,314.63** |  |

### Deposits and Credits

| Ledger Date | Description | Amount |
|---|---|---|
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |

Please examine this statement of account at once.  By continuing to use the account, you agree that: (1) the account is subject to
the Bank's deposit account agreement, and (2) the Bank has no responsibility for any error in or improper charge to the account
(including any unauthorized or altered check) unless you notify us in writing of this error or charge within sixty days of the mailing or
availability of the first statement on which the error or charge appears.

# EXHIBIT 5

CNN Money

Companies    Markets    Tech    Media      U.S. ▼

# How a big bet on oil went bust: Full version



Erlend Olson: "We figured that if we could make a treasure map of where the oil is, why not go dig the treasure ourselves?"

PHOTO: ART STREIBER

By Adam Lashinsky, senior editor at large March 29, 2010: 9:59 AM ET

(Fortune) -- In the summer of 2008, Erlend Olson thought he had finally hit the jackpot.

A bit player in semiconductors for years, the former NASA engineer had made an improbable metamorphosis into a burgeoning oil-exploration kingpin. His company, Terralliance Technologies, a secretive startup in Newport Beach, Calif., had developed an algorithm for telling petroleum engineers where to drill.

| Facebook | Digg |
| Twitter | Buzz Up! |
| Email | Print |
| Comment on this story | |

Never mind that Olson was an electrical engineer with no background in oil. He had convinced some of the world's most sophisticated investors, including Goldman Sachs (GS, Fortune 500) and Kleiner Perkins, that his unconventional approach was legit.

Kleiner would go on to bet a whopping $93 million on Terralliance, a sum that may be the storied firm's largest venture investment ever.

Terralliance hadn't found much oil, but its founder and CEO was so adept at locating cash reserves that he believed he was about to close a deal that would seal his company's future -- and his fortune.

He had come to New York that August to negotiate a financing with Temasek, the sovereign wealth fund of Singapore, which Olson had been romancing for months. The price of oil had recently soared to $145 a barrel, and Temasek planned to invest $1.1 billion, valuing Terralliance at more than $4 billion.

A hulking figure with a glassy-eyed intensity, Olson had assured his investors that an infusion of this magnitude could lead quickly to a public offering worth as much as $60 billion. That would make Olson, as he wistfully recalled later, a "three-comma guy."

Olson wasn't alone in counting commas. Kleiner Perkins thought it was on the threshold of its first mega-win since Google's (GOOG, Fortune 500) IPO in 2004. Goldman Sachs, which had been betting shrewdly on plummeting housing prices, envisioned another killing. Passport Capital, a young San Francisco hedge fund, anticipated burnishing its reputation for energy investments. John Fredriksen, a Norwegian supertanker mogul who had lent Terralliance $50 million only months earlier, stood to score a quick hit.

All told, the investors had sunk nearly half-a-billion dollars into Terralliance, an astounding sum given the audacity of the company's aspirations -- and the paucity of its accomplishments.

## Right Now

7 things to know before the bell

SoftBank and Toyota want driverless cars

Aston Martin falls 5% in its London IPO



## Hot List

**Frontline troops push for solar energy**
The U.S. Marines are testing renewable energy technologies like solar to reduce costs and casualties associated with fossil fuels.
Play



**25 Best Places to find rich singles**
Looking for Mr. or Ms. Moneybags? Hunt down the perfect mate in these wealthy cities, which are brimming with unattached singles.
More



**Fun festivals: Twins to mustard to pirates!**
You'll see double in Twinsburg, Ohio, and Ketchup lovers should beware in Middleton, WI. Here's some of the best and strangest town festivals.
Play



## Original Shows

**Key to NBA's success? Embracing tech** NBA Commissioner David Stern says the basketball league is looking to expand its use of technology to improve gameplay and increase its audience.
Play



**Unique Homes**
Selling Roy Rogers' former ranch With 67 acres of land and room for 150 horses, the former ranch of the 'King of the Cowboys' sold at auction for $640,000.
Play



**Help Desk**
Track testing tires to find the best Find out how TireRack tests and reviews tires and why choosing the right ones for your car is so important.
Play



All CNNMoney.com Original Shows

## Markets

| Market Movers | | US Indices | |
| --- | --- | --- | --- |
| Company | Price | Change | % Change |
| Ford Motor Co | 8.29 | 0.05 | 0.61% |
| Advanced Micro Devic... | 54.59 | 0.70 | 1.30% |
| Cisco Systems Inc | 47.49 | -2.44 | -4.89% |
| General Electric Co | 13.00 | -0.16 | -1.22% |
| Kraft Heinz Co | 27.84 | -2.20 | -7.32% |

Data as of 2:44pm ET

symbol [ ] Go     Sponsored by

Sponsors

Why experienced investors pumped so much capital into such a risky venture is just one mystery in the tale of Terralliance, a saga that has not been comprehensively told despite the high profiles of the players involved.

Kleiner Perkins, a firm that loudly promotes its most promising investments, for years didn't list Terralliance on its website and declined multiple requests to comment for this article. Despite interviews with many of the key people involved, it's also not clear what exactly Terralliance's technology purported to do, or how well its investors understood it.

What is certain is that Terralliance's gambit to become a force in oil exploration ended badly. Despite Olson's high expectations, the unraveling began during those August 2008 meetings in New York.

Before taking Temasek's cash, Kleiner and Goldman thought it was important to share concerns they had about Olson. Terralliance's globetrotting CEO may have been an oil industry neophyte, but he had spent like a Saudi prince. His shopping list ran the gamut from oil wells in Turkey and Mozambique to demilitarized Soviet fighter jets.

An auditor had raised red flags about Olson's dealings in the Congo and referred its findings to the U.S. Justice Department for potential anti-bribery-law violations. As troubling, Terralliance had yet to close its books on 2007. Two lead board members, Joe Lacob of Kleiner Perkins and Joe DiSabato of Goldman, informed Temasek's lead negotiator, Nagi Hamiyeh, that they intended to demote the charismatic but free-spending founder to chief scientist.

It was all too much for someone wielding a city-state's checkbook. Instead of signing on the dotted line, Hamiyeh returned to Singapore. In early 2009 the board fired Olson outright. By then the price of oil had cratered, Temasek's stock market holdings had collapsed, and Terralliance had all but crumbled into a heap of litigation, layoffs, and recriminations.

By the spring Kleiner Perkins was in damage-control mode on Terralliance, even as it was promoting a new thrust into the field of "green" energy. As for Olson, who was out of work and raising new funds to continue his global quest for oil, not adding a comma to his net worth was the least of his worries.

Olson didn't set out to look for oil. As the dotcom bubble was peaking in 2000, he found himself at a crossroads. Then 37, he had spent 14 years at NASA's Jet Propulsion Laboratory (JPL) in Pasadena, which runs the country's unmanned space probes.

After leaving JPL, Olson co-founded a semiconductor company in 1998 called Pivotal Technologies, where he was chief technology officer. Pivotal made chips for cable modems and Bluetooth devices, and its designs were in hot demand, enabling it to sell out to Broadcom after just two years for $605 million.

A government employee for most of his working life, Olson suddenly was wealthy. Not super-rich, mind you, but way beyond his space agency peers. "I went from making $65,000 a year to being worth millions," says Olson, who years later still affects the look of a gussied-up engineer: open-neck shirts, faded blue jeans, and black wingtips.

Olson was a rare twofer in the IT world: a technologist who could tell a story. "Erlend is a larger-than-life guy, and he always was," says an executive who worked with him at Pivotal. "He was the franchise. There was an engine under that hood." At Pivotal, however, Olson didn't have free rein, says this executive. "Erlend is like a nuclear reactor: If you use him properly, the guy can boil water. If you use him improperly, he can melt down the city."

Actually, finding water, not boiling it, happened to be Olson's goal. As he tells it, his parents, who had retired from positions at the top-secret Sandia National Labs in New Mexico, were missionaries in Africa and complained to him about the difficulty of drilling water wells.

NASA's projects search for signs of life on and beneath planetary surfaces, including the presence of water. Together with some other ex-JPL buddies, Olson began tinkering with publicly available satellite data of terrain near his home in Southern California. Olson also had familiarity with remote-sensing

technology deployed by NASA. He had designed low-power chips crucial to running communications systems millions of miles from Earth.

The noodling by Olson and his JPL pals yielded an unexpected eureka moment. "We kept running into oilfields, which was frustrating because we were looking for water. I knew nothing about the oil business or the fossil-fuels business," says Olson, who told Fortune his story in numerous interviews over the past year at hotels and restaurants in Southern California.

As he continued to investigate tracts that encompassed some of the oldest and once most productive oilfields in the U.S., Olson made another startling discovery: "We'd notice there was no pump jack, even though we knew there was oil there."

The team spent the next couple of years modeling known oilfields and developing an algorithm to test the model's predictive power. Olson likens the experimentation to writing a program for forecasting stock market fluctuations and then testing it on historical pricing data. The next step was putting the technology to work. "We figured if we could make a treasure map of where the oil is, why not go dig the treasure ourselves?"

Olson funded operations of the new company out of his own pocket. He studied the oil and gas business and deemed it technologically timid. His approach to finding hydrocarbons went beyond the two tools most favored by the industry.

One is seismography, the bouncing of sound waves off structures beneath the ground in the hunt for what geophysicists call anomalies -- abrupt changes in the substructure that suggest that worthless dirt may have given way to valuable minerals. The other is geology, or the analysis of rocks to see whether their makeup suggests the presence of something worth drilling for.

Olson's approach was to test for a series of indicators in the ground -- an example is electrical activity that can be detected remotely -- that when combined with massive computer files would yield accurate probability studies on the chances of finding oil. The mapping technique was a first step, to be followed by the industry's standard geophysical practices.

Whether it was real science or high-tech dowsing, Olson used his findings to pitch investors. Kleiner's Lacob and Goldman's DiSabato invested a total of $45 million in 2004 and 2005. (DiSabato had profitably invested in Pivotal.)

Kleiner and Goldman opened all kinds of doors. Olson was introduced to the respected oil executive Joe Foster, founder and former CEO of Newfield Exploration and a banking client of Goldman's in the 1990s. Terralliance "had Kleiner Perkins and Goldman behind it," says Foster. "They told me about this, and I said it sounds too good to be true."

Nevertheless, in the Continental Airlines lounge at the Houston airport, Foster met with Olson. "Erlend sort of knocked my socks off. It didn't make sense to me that you could acquire that kind of data with a satellite. But I left the meeting saying, 'Shit, I'd better think about this.'" Foster joined Terralliance's board in 2005.

Excitement about a sure-fire way to find oil -- and all sorts of other valuable things -- isn't new, of course. "The real story, to boil it down, is as old as mankind: a charismatic individual with a compelling story you just want to believe," says Foster, who says he lost several hundred thousand dollars of his own money in Terralliance. "My whole career I've been interested in alternative exploration tools. By force of personality, [Olson] convinced a lot of people. There's a real psychological story there. This was beyond numbers and contours."

Investors wanted proof, so Terralliance began mapping small projects and then drilling for oil and gas. Success was relative. The company's maps accurately indicated oil was present in previously active oil basins -- albeit in places previous drillers hadn't explored -- in locations including Oklahoma and Alberta.

Though not a huge surprise, these finds helped Terralliance make the case for bigger projects. The company raised an additional $248 million in mid-

2006, with new investors including Ithmar Capital, a private equity firm in Dubai.

Olson was the fundraiser-in-chief as well as head negotiator for the drilling leases he was signing around the world. At one point Terralliance claimed to be drilling for oil or negotiating rights to explore for it on four continents, including eight African countries. An oilfield in eastern Turkey produced some oil, though it turned out not to be commercially viable when oil prices dropped. An expensive well in Mozambique turned up all but dry. Many of Terralliance's other proposed projects never broke ground.

Olson decided that Terralliance needed to make its own maps rather than rely on purchased satellite data. So the company bought an airplane and a helicopter, each fitted with custom-designed sensors. For Olson, this "low and slow" approach was a half-measure. He craved the "high and fast" capability of U-2 spy planes that NASA uses for research.

U-2s aren't available for commercial use, however, so Olson arranged to buy two surplus Sukhoi SU-27 "Flanker" fighter jets, stars of the Cold War-era Soviet air force, from the Ukrainian government. Terralliance paid $22 million for the pair of jets, as well as more than $4 million for an option to purchase two others.

Olson says the planes cost more than conventional, slower aircraft but are more effective because they can cover more ground. "It was like a NASA platform but better," he says. "I got the blue-collar version of the U2."

By 2007, Terralliance was running out of cash, despite having raised nearly $300 million in less than three years. Olson is unapologetic about the outlays. "We spent like NASA during the Apollo program, and we were on our way to the moon as well," he says.

Stephen Buscher, an oil industry investment banker, relocated from Russia at the end of the year to become Terralliance's chief financial officer. He marveled at Olson's persuasive powers. "It's unbelievable how easy it was to sell that story with Erlend manning the PowerPoint," says Buscher, who signed on to take Terralliance public and has since left the company.

One PowerPoint obtained by Fortune sheds light on Olson's technique. In an October 2007 presentation to Kleiner's partners, he proclaimed Terralliance a "Revolution in Oil and Gas Exploration." He declared that the company had 500 million acres in "oily places" under its control, more than Exxon Mobil, a claim that seems to have encompassed everything from partnership agreements to discussions with governments.

Olson had no doubt that if Terralliance could just raise more money, it had "all the projects necessary to be as valuable" within five years as Occidental Petroleum. Oxy, a decades-old oil company, was worth more than $60 billion.

There was never a shortage of potential investors willing to listen to Olson's pitch. In early 2008, Temasek emerged as the most enthusiastic. The Singaporean fund had begun a major thrust in oil acquisitions, forming a special subsidiary, Orchard Energy, as its petroleum vehicle.

Temasek dispatched consultants to study Terralliance's technology, as well as its petroleum assets. In the meantime Terralliance needed funding to keep the drill bits turning. Through Goldman connections again, it met Passport Capital, whose founder, John Burbank, had been a top-performing U.S. hedge fund manager in 2007. Passport agreed to lend Terralliance $150 million -- a bridge loan -- with the expectation that the loan would be repaid in a matter of months.

To share the risk, Passport offered a third of its Terralliance loan to an investment firm in London called Franklin Enterprises. Franklin is a private investment arm of Norway's John Fredriksen, CEO of Frontline, a major oil tanker operator.

Passport told Franklin about a company code-named Project Sunshine, whose backers included the original investors in Google and which promised to be the "Google of the oil and gas industry," according to a lawsuit Franklin later filed against Passport. The pitch worked; Franklin invested in March.

How Terralliance was spending its capital became a central sticking point. The company hired a chief accounting officer named Howard Selzer, who had worked at Enron in its dark days.

Selzer hired PricewaterhouseCoopers, and together they became a thorn in the side of the CEO. Olson hadn't kept particularly good records in the early years of the company. Accounting for travel expenses was notably weak, and Selzer eventually identified $4.4 million of expenses Olson owed the company.

The auditors also had a devil of a time accounting for the business uses of all the company's property. A warehouse near Pasadena was supposed to contain aircraft parts but upon investigation was full of earthmoving equipment as well as a masterfully crafted baby crib. Olson had a side business in real estate development, and his wife had recently given birth to their first child. Olson -- who says the facility was Terralliance's original headquarters and that he had permission to store his belongings there -- personally sublet the warehouse from the company.

The auditors also accused him of making questionable payments to government officials in the Congo, where Terralliance had signed a drilling concession, and referred the matter to the U.S. Justice Department. (No one involved is aware of any actions taken in the case by Justice, which declined to comment. Olson also declined to comment on this.)

By then, board members -- in particular Kleiner's Lacob and Goldman's DiSabato -- had had enough of Olson. But there was a catch. He was the main point of contact with Temasek, and he also told Terralliance's story better than anyone else.

In an effort to remove his authority but keep him onboard, the board demoted Olson in September 2008 to chief scientist. The next month, when the auditors finally closed the books on 2007, they noted that Terralliance "renounced the concession interest" in the Congo, and that the "former officer" who negotiated it, Olson, "no longer had the authority to legally bind the company."

With so much turmoil, it's no wonder that Singapore's Temasek hit the pause button on its investment in August 2008. Fredriksen's Franklin Enterprises also caught wind of the controversy and asked Passport for its money back. Passport rejected the request, and in October, Franklin filed suit against Passport, charging the San Francisco firm with misleading it about the nature of Terralliance's management and finances. (In a court filing Passport denied the allegations.)

The Soviet fighter jets seemed a flamboyant purchase; some people involved with the company even doubted their existence. Whether or not they were a good idea, the planes were real. The same month that the auditors completed their work and Fredriksen sued Passport, the jets arrived unassembled at a commercial hangar in Rockford, Ill. The planes remain there and are for sale for $5 million apiece.

According to Pride Aircraft, which is marketing the planes, the twin fighter jets were "painted in the standard Russian air-superiority blue/gray camouflage scheme by the Ukrainian overhaul facility" that outfitted them for commercial use. The SU-27s never flew a mission for Terralliance.

In the year since Erlend Olson had told the Kleiner Perkins partners that his company could soon be worth $60 billion, the world had become a different place -- for Terralliance, for Wall Street, and for so many others. Terralliance's senior executives made a last-ditch effort to woo Temasek in November 2008. The deal team watched Barack Obama's acceptance speech from a Temasek conference room in Singapore. By this time, though, the price of oil had fallen to $60 a barrel, and Temasek formally walked away in December.

Kleiner Perkins moved swiftly in 2009 to try to salvage its investment. John Doerr, Kleiner's most prominent partner, hadn't previously been actively involved with Terralliance, but he began attending board meetings. He hired as executive chairman a longtime confidant, Mike Long. Doerr flew to London to meet with Franklin in the hope of resolving the litigation with Passport. He enlisted computing pioneer and Kleiner partner Bill Joy to evaluate Terralliance's technology.

In May, Terralliance announced new funding, which amounted to a restructuring of the company that severely diluted the stakes of existing investors. Kleiner, Goldman, Passport, and others invested an additional $54.2 million, $30.5 million of which ultimately went to Franklin. An additional $7 million was promised by the end of 2010 to Franklin, which dropped its suit against Passport.

With Olson gone -- he was fired as an employee in March and left the board in May -- Terralliance abandoned its wildcatting dreams. The investors still believe there's something to the mapping technology. So instead of buying drilling rights, today the company -- renamed TTI Exploration -- is charting plots on a project basis for clients.

Last July, Terralliance filed suit against Olson for misappropriation of trade secrets, alleging that he had failed to return documents belonging to the company and had started a new venture based on Terralliance's intellectual property.

There has been no activity in the suit since then because TTI doesn't know where Olson is and can't serve him with court papers, says TTI lawyer David Schindler of the Silicon Valley office of Latham & Watkins. Olson calls the company's claims baseless and says the lawyers shouldn't have any trouble serving him: "My wife doesn't seem to have any trouble finding me."

Of the many unanswered questions in the strange story of Terralliance, two stand out: Was there ever anything to the technology, and how could such seasoned financiers have invested so much money with so little control over it and in an industry with which they were so unfamiliar?

Given that Olson never patented the technology and otherwise wouldn't document it for his own investors, it's problematic for any outsider to judge it. He certainly believes that it works, and he says that consultants from Temasek's Orchard Energy blessed it.

That claim can't be verified because Temasek declined to comment for this article. Joe Foster, the former board member, says he still doesn't know whether the technology worked. "The way I came to look at this was as a very good reconnaissance tool," he says. "It would tell you where to do more work -- or to get the hell out."

Kleiner Perkins certainly believed. "They perceive themselves to be great venture capital investors and capable of taking substantive risks," says Foster. "I spent an afternoon with Kleiner. They were sold. They didn't necessarily have any technical background for this, but they had hired consultants. I had plenty of technical capability, and I got sucked right in too."

Kleiner Perkins declined to comment on Terralliance, citing the ongoing, if inactive, litigation against Olson. So did Goldman and Passport. Franklin Enterprises did not respond to requests for comment. Kleiner partner Joe Lacob, who exited the board last year, said in an e-mail: "Clearly, the economic upheaval of late 2008 and early 2009 dictated business-model changes for many, many companies. [Terralliance], through the efforts of many, has successfully navigated those waters and emerged, arguably, stronger than ever."

As for Erlend Olson, he has formed a new venture and has been spending his time in airplanes again, particularly between California and Africa. He still burns with the same intensity. But where once he searched for water, then for oil, now he's looking for validation.

--*Reporter associate: Doris Burke* ∎

|  | **Email** | **Print** |
|---|---|---|

First Published: March 29, 2010: 9:56 AM ET

## Sections

| COMPANIES | ECONOMY | TECHNOLOGY | SMALL BUSINESS | PERSONAL FINANCE |
|---|---|---|---|---|

**Toys 'R' Us brand may be brought back to life**
Bankrupt toy retailer tells bankruptcy court it is looking at possibly reviving the Toys 'R' Us and Babies 'R' Us brands.
More

**JCPenney names Jill Soltau as its new CEO**
**S&P downgrades debt-riddled GE and GE Capital**

**Land O'Lakes CEO Beth Ford, from the cornfield to the C-suite**
Land O'Lakes CEO Beth Ford charts her career path, from her first job to becoming the first openly gay CEO at a Fortune 500 company in an interview with CNN's Boss Files. More

**Goldman Sachs slants research to help Democrats, top White House adviser says**
**China says it will never use its currency as a weapon in the trade war**

**Honda teams up with GM on self-driving cars**
Honda and General Motors are creating a new generation of fully autonomous vehicles. More

**The internet industry is suing California over its net neutrality law**
**Bumble to expand to India with the help of actress Priyanka Chopra**

**South Africa's first black female winemaker ready to go it alone**
In 1998, Ntsiki Biyela won a scholarship to study wine making. Now she's about to launch her own brand. More

**Want to clean up India? Turn trash into free Wi-Fi**
**Drones, robots, DIY toys shine at Toy Fair**

**How can I protect my investments from inflation?**
Whether you hedge inflation or look for a return that outpaces inflation, here's how to prepare. More

**How to catch up on retirement savings in your 50s**
**How do you know you're really ready to retire early?**



Contact Us

Closed Captioning

Site Map

   

Most stock quote data provided by BATS. Market indices are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET. Disclaimer. Morningstar: Â© 2018 Morningstar, Inc. All Rights Reserved. Factset: FactSet Research Systems Inc. 2018. All rights reserved. Chicago Mercantile Association: Certain market data is the property of Chicago Mercantile Exchange Inc. and its licensors. All rights reserved. Dow Jones: The Dow Jones branded indices are proprietary to and are calculated, distributed and marketed by DJI Opco, a subsidiary of S&P Dow Jones Indices LLC and have been licensed for use to S&P Opco, LLC and CNN. Standard & Poor's and S&P are registered trademarks of Standard & Poor's Financial Services LLC and Dow Jones is a registered trademark of Dow Jones Trademark Holdings LLC. All content of the Dow Jones branded indices Â© S&P Dow Jones Indices LLC 2018 and/or its affiliates.

© 2021 Cable News Network. A WarnerMedia Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy.

# EXHIBIT 6

## SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CENTRAL JUSTICE CENTER

### MINUTE ORDER

DATE: 04/02/2012                    TIME: 01:46:00 PM        DEPT: C12

JUDICIAL OFFICER PRESIDING: Jamoa A. Moberly
CLERK: SUSIE GARCIA
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2010-00346521-CU-BC-CJC** CASE INIT.DATE: 02/22/2010
CASE TITLE: **Passport Management, LLC vs. Olson**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 71449162
**EVENT TYPE:** Chambers Work

### APPEARANCES

The Court, having taken the trial in the above-entitled matter under submission on 3-7-2012, now makes the following ruling:

### Tentative Statement of Decision

This matter was tried to the Court as between Plaintiff Passport Management, LLC and defendant Erlend Olsen, an individual. Trial concluded March 7, 2012.
The following is the Court's tentative statement of decision.

Facts

The basic facts are not in dispute as to the creation of the 2005 Notes. In 2005, defendant Erlend Olson who was then Chief Executive Officer of Terralliance made five promissory notes in favor of his then employer Terralliance. Ex. 4. He had been with the company since founding of it. The notes were created to show Olson's obligation to repay Terralliance for five advances totaling $613,430.80 that Terralliance made to Olson in order for Olson to acquire personal shares of Terralliance common stock from other Terralliance shareholders. This is not in dispute. The shares were later sold by Olson for a substantial profit. The notes were never repaid. Each of the 2005 notes matured on March 30, 2010. Each remains due and owing.

In the fall of 2007, an audit was commenced in conjunction with the attempt by Terralliance to obtain financing in the range of one billion dollars from a large investor, Temasek, a sovereign wealth fund from Singapore. An independent audit report was required for such financing. Olson was approached by the

CASE TITLE: Passport Management, LLC vs. Olson        CASE NO: **30-2010-00346521-CU-BC-CJC**

then CFO of Terralliance, Howard Selzer, regarding the documentation and characterization of numerous charges and advances attributed to him and whether they were personal expenses. As a condition to Passport making the bridge loan to Terralliance in March 2008, Olson was required to represent that he would repay the unauthorized charges which at that time were still being determined. This led to creation of the 2008 promissory Note. It is undisputed that Olson executed the original Note and sent a copy of the Note to Terralliance senior executives, board members and legal advisors by e-mail on October 31, 2008. Ex. 11. The face amount of the note was $4,438,989 and outside maturity date December 31, 2009. The independent audit was completed soon after with reference therein to the executed note. In spite of demands on Olson, he did not deliver the original note. Shortly thereafter Passport made another loan to Terralliance of over seven million. In December 2008, the Temasek deal fell through. Olson never delivered the original 2008 signed Note but never said he would not deliver it nor did he ever disclose its whereabouts after his October 31, 2008 e-mail.

In May 2009, Terralliance entered into a workout and recapitalization agreement with Passport Management LLC following the multiple loans to Terralliance in 2008. As part of that agreement dated May 13, 2009 titled Strict Foreclosure Agreement ("SFA"), Terralliance agreed to Passport's foreclosure on the collateral that secured the prior loan which collateral included the 2005 and 2008 notes. Ex. 52. The collateral included all six notes issued by Olson to Terralliance and also any other notes issued by Olson for any advances made by the company to Olson prior to the date of the SFA.

The 2005 Notes

Olson has not denied his obligation to pay each of these notes. The original notes all bear Olson's signature. None of these notes have been paid. Under the SFA, Passport is entitled to enforce payment of these notes. Passport is the holder in fact and in due course of each of the 2005 Notes. It was clearly the intent of the parties that the allonges be attached to the notes and be enforceable by Passport. Olson has asserted no defense to his obligation to pay these notes which are all in default once it is established that Passport is entitled to payment.

The 2008 Note

Olson is estopped to claim that the original 2008 note was not signed by him and that the e-mail copy he sent was not enforceable. Olson sent it intending that it be relied upon as duly enforceable. This is clear from the face of the transmittal e-mail on October 31, 2008. There is no evidence that Olson did not so intend. That all sides were treating the e-mail copy as enforceable is shown by the omission of any reference to delivery of the original signed 2008 note in the list of other materials which Terralliance demanded from Olson in its letter of termination dated March 2, 2009. Ex. 102. There is no evidence that Olson was acting under any duress or coercion in signing and transmitting the 2008 Note. The Foreign Corrupt Practices Act investigation was ongoing in spring 2008 concerning activities in Africa and Olson was provided counsel and had conclude in October 2008. Independent counsel was retained by the Audit Committee to conduct the investigation. The advances encompassed by the 2008 Note were broad and not documented as authorized company expenses. The Price Waterhouse Coopers audit report dated November 28, 2008 noted the six promissory notes of Olson and amounts thereof as well as the status of the FCPA investigation. Ex. 30 at page 27. Completion and delivery of this audit was a condition precedent to the Temasek funding.

Defenses

Olson has asserted no defenses to enforcement of the 2005 Notes other than to assert that allonges had

CASE TITLE: Passport Management, LLC vs. Olson          CASE NO: **30-2010-00346521-CU-BC-CJC**

to be stapled to the notes at the time of transfer to Passport. There has been no evidence challenging the authenticity of the original notes. Ex. 4. There is no evidence of any coercion or duress surrounding Olson's execution of the 2005 Notes. The Notes are enforceable as against Olson by Passport under the terms of the SFA. As for the 2008 Note, the amount of the Note as reduced by the return of a truck vehicle by Olson is undisputed. Both the independent auditors and the counsel for Olson characterized the amount as due and owing by Olson. The FCPA investigation was not used to coerce Olson to sign the note. Rather Olson signed the 2008 note to facilitate the Temasek deal. Olson had already been demoted to Chief Scientist in September 2008.

Account Stated and/or Money Had and Received

Based on the evidence, in the event any of the notes are unenforceable then alternatively each of the face amounts and terms of the notes constitute accounts stated as against Olson by Terralliance, thus Passport as its successor in interest per the SFA. The sums reflected by each of the six notes less the amount of the returned vehicle reflect money of Terralliance received by Olson of his personal purposes and are still due and owing.

Damages

2005 Notes: The principal amounts total $613,430.80. The annual interest rate is 3.83%. The accrued interest as of 2-21-2012 is $152,301.99. Total principal and interest as of 2-21-2012 is $765,732.79. Daily interest shall accrue in 2012 on the principal at the 3.83% rate at $64.19 per day (366 days/year).

2008 Note: The principal is $4,363,639.26 (factoring in the payment for tender of the F-750 truck). The annual interest rate is 6%. The accrued interest as of the date of trial of 2-21-2012 is $872,173.54. The total principal and interest as of 2-21-2012 is $5,235,812.80. The daily rate of interest accrual on principal in 2012 at 6% is $715.35 (366 days/year).

This tentative decision shall constitute the statement of decision unless within 10 days either party specifies controverted issues or makes proposals not offered in the intended decision. Cal Rules of Court 3.1590.

Counsel for Passport is directed to prepare and submit a judgment consistent with this announcement.

Dated: April 2, 2012

Jamoa A. Moberly
Judge of the Superior Court

# EXHIBIT 7



# Litigation Highlights 2012
## DELIVERING SUCCESS ACROSS INDUSTRIES



Pillsbury Winthrop Shaw Pittman LLP

ATTORNEY ADVERTISING. Results depend on a number of factors unique
to each matter. Prior results do not guarantee a similar outcome.

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway | New York, NY 10036 | 877.323.4171

www.pillsburylaw.com
© 2013 Pillsbury Winthrop Shaw Pittman LLP. All rights reserved.

## Recovering Millions for a Hedge Fund Client

When our client Passport Capital made its investment in Terralliance Technologies, it thought it was buying into a fast-growing startup with a promising idea for optimizing oil field exploration. According to *Fortune* magazine, Terralliance had previously received large investments from Goldman Sachs and the venture capitalists at Kleiner Perkins.

Passport's investment in Terralliance was comparatively modest, but sizeable for the young San Francisco hedge fund. So when Terralliance collapsed amid allegations of mismanagement and misappropriation of funds by its founder, Passport turned to Pillsbury for help.

Passport had made significant bridge loans to Terralliance while the startup was waiting for a $1.1 billion financing from a Singaporean sovereign wealth fund. Investors were attracted by the compelling concept that Terralliance had developed an algorithm for successfully identifying underground oil fields based primarily on satellite data.

But the Singapore investors balked after finding out that Terralliance founder Erlend Olson, a charismatic former NASA engineer, had wired himself substantial amounts of company money without documenting any business justification. Olson had also reimbursed himself for family vacations, for visits to gentlemen's clubs, and for tens of thousands of dollars in jewelry purchases.

Terralliance defaulted on its loans and assigned to Passport various promissory notes from Olson. When Passport's lawsuit for nonpayment finally came to trial in 2012, Olson boldly argued he was the victim of a conspiracy on the part of Terralliance's investors.

After a nine-day trial, Pillsbury defeated all of Olson's defenses and secured an award in excess of $6 million, plus attorney's fees and costs.

| Client: | **Passport Capital** |
|---|---|
| Industry: | Financial Services |
| Area of Law: | Contracts |
| Venue: | California Superior Court, Orange County |
| Result: | After a nine-day bench trial, won an award of more than $6 million plus attorneys' fees and costs |



" The lesson on this case is that perseverance pays off. "

—William Alberti, General Counsel and Chief Compliance Officer for Passport Capital

EXHIBIT 8

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 05/11/2012          TIME: 10:30:00 AM          DEPT: C12

JUDICIAL OFFICER PRESIDING: Jamoa A. Moberly
CLERK: Gus Hernandez
REPORTER/ERM: Kimberly Rex-6638 CSR# 6638
BAILIFF/COURT ATTENDANT: Maria Concepcion

CASE NO: **30-2010-00346521-CU-BC-CJC**  CASE INIT.DATE: 02/22/2010
CASE TITLE: **Passport Management, LLC vs. Olson**
CASE CATEGORY: Civil - Unlimited          CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 71460047
**EVENT TYPE**: Review Hearing

**APPEARANCES**

Thomas V Lloran, from PILLSBURY WINTHROP SHAW PITTMAN LLP, present for Plaintiff(s).
Erlend Olson, self represented Defendant, present.

Hearing held. Court and counsel discuss the 6th Cause of Action of the 4th Amended Complaint. The 6th Cause of Action has previously been severed for trial.

The Court now sets a Trial Setting Conference as to the 6th Cause of Action for 06/11/2012 at 10:00 AM in Department C12.

Request for Dismissal as to Erlend Olson on the 6th Cause of Action is filed this date.

Court hears oral argument as to the Proposed Statement of Decision, Objections and Responses to Objections. The Court's tentative statement of decision now becomes the final statement of decision of the Court. Judgment signed and filed this date.

EXHIBIT 9

**FTB** STATE OF CALIFORNIA
**Franchise Tax Board**

# Financial Statement

Provide all of the following information. See instructions on pages 4 and 5 for assistance.

| **Taxpayer Name:** Erlend Olson | **Spouse/RDP Name:** |
|---|---|
| Social Security Number | Social Security Number: |
| Driver License Number: | Driver License Number: |
| Home Phone Number: | Home Phone Number: |
| Cell Phone Number: | Cell Phone Number: |
| Work Phone Number: | Work Phone Number: |
| Address: | Address: |
| ✔ Mark here if you would like us to update our records with the address listed above. | Mark here if you would like us to update our records with the address listed above. |

## List All Dependents and Nonrelatives Living With You

| Name: | Name: _____ Age: ____ Relationship: ____ |
|---|---|
| Name: | Name: _____ Age: ____ Relationship: ____ |

## Employment Information (If self-employed, see Section I.)

| **Taxpayer** | **Spouse/RDP** |
|---|---|
| Employer: SELF EMPLOYED | Employer: |
| Address: | Address: |
| City, State, ZIP Code: | City, State, ZIP Code: |
| Employer Phone Number: | Employer Phone Number: |
| Occupation: | Occupation: |
| How Long Employed: | How Long Employed: |

## Section A. Accounts – Include checking, online, mobile (e.g., PayPal) and savings accounts, prepaid debit cards, certificates of deposit, trusts, individual retirement accounts (IRAs), Keogh plans, simplified employee pensions, 401(k) plans, profit sharing plans, mutual funds, stocks, bonds, and other investments, including business accounts.

| Name of Financial Institution | Account Number | Type of Account | Current Value | Business |
|---|---|---|---|---|
| | | | | ✔ |
| | | | | |
| | | | | |
| | | | | |

## Section B. Credit Cards and Lines of Credit – VISA, MasterCard, American Express, department stores and lines of credit, etc.

| Type/Name of Financial Institution | Credit Limit | Account Number | Balance Owed |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |

## Section C. Real Estate – Include home, rental properties, vacation properties, timeshares, vacant land, and other real estate.

| Address | Primary Residence | Amount Owed | Equity |
|---|---|---|---|
| None | Yes    No | | |
| | Yes    No | | |
| | Yes    No | | |

## Section D. Other Assets – Include cars, boats, recreational vehicles, life insurance, artwork, jewelry, etc.

| Description | Monthly Payment | Year Purchased | Current Value | Balance Owed |
|---|---|---|---|---|
| None | | | | |
| | | | | |

See the instructions on pages 4 and 5 for assistance.

## Section E. Monthly Income

|  | | | | | | FTB Use Only |
|---|---|---|---|---|---|---|
| How often are you paid? (mark one) . . . . . . . . . . . | Weekly | Biweekly | Semi-Monthly | ✔ Monthly | | |
| How often is your spouse/RDP paid? (mark one) . . | Weekly | Biweekly | Semi-Monthly | Monthly | | |

| | | |
|---|---|---|
| Net Pay (from wages and/or self-employed income) . . . . . . . . . . . . . . . . . . . . . . . .$ | 60,000.00 | |
| Spouse's/RDP's Net Pay (from wages and/or self-employed income). . . . . . . . . . .$ | 0.00 | |
| Net Rental Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Retirement (IRA, 401K, pension, etc.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Unemployment/Disability/Social Security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Commissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Other Income    Dividends    Interest    Child Support | | |
|     Royalties    Alimony    Other (List _____). . .$ | 0.00 | |
| Amounts Contributed from Other People Living in Your Home . . . . . . . . . . . . . . . .$ | 0.00 | |
| **Total Monthly Income** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 60,000.00 | |

## Monthly Necessary Expenses

### Section F. Local Standards

#### Housing and Utilities

| | | |
|---|---|---|
| Rent/Mortgage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 4,350.00 | |
| Electric, Oil/Gas, Water/Garbage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Telephone/Cell/Cable/Internet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Real Estate Taxes and Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Maintenance and Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 125.00 | |
| **Sub Total**    Mark box if IRS standard used. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 4,475.00 | |

#### Transportation

| | | |
|---|---|---|
| Transportation Ownership Costs    Mark box if IRS standard used . . . . . . . . . .$ | 1,470.00 | |
| Transportation Operating Costs    Mark box if IRS standard used. . . . . . . . . . . .$ | 450.00 | |
| Public Transportation    Mark box if IRS standard used. . . . . . . . . . . .$ | 220.00 | |
| **Sub Total** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,140.00 | |

### Section G. National Standards

| | | |
|---|---|---|
| Food. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,790.00 | |
| Housekeeping Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 100.00 | |
| Clothing and Clothing Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 290.00 | |
| Personal Care Products and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 40.00 | |
| Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 340.00 | |
| **Sub Total**    Mark box if IRS standard used. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,560.00 | |
| Out of Pocket Health Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 140.00 | |
| **Sub Total**    Mark box if IRS standard used. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 3,700.00 | |

### Section H. Other

| | | |
|---|---|---|
| Child/Dependent Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,100.00 | |
| Federal Estimated Tax Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| State Estimated Tax Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Term Life Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Retirement (IRA, 401K, Pension, etc.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Federal Installment Agreement (approved amount). . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Student Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 | |
| Court Ordered Child Support/Alimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 22,650.00 | |
| Health Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,250.00 | |
| Other (specify) PAYMENT TO US TREASURY DEPT . . . . . . . . . . . . . . . .$ | 4,230.00 | |
| Other (specify) COURT ORDERED SCHOOL TUITION . . . . . . . . . . . . . . . .$ | 4,500.00 | |
| Other (specify) LEGAL PAYMENTS/FEES . . . . . . . . . . . . . . . .$ | 9,500.00 | |
| Other (specify) ESTIMATED TAXES . . . . . . . . . . . . . . . .$ | 10,200.00 | |
| **Sub Total** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 55,430.00 | |

| | | |
|---|---|---|
| **Total Monthly Income** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 60,000.00 | |
| **Total Monthly Necessary Expenses**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 65,745.00 | |
| **Net (difference between income and expenses)**. . . . . . . . . . . . . . . . . . . . . . . . . .$ | -5,745.00 | |

See the instructions on pages 4 and 5 for assistance.

## Section I. Business Information

| Name of Business | FEIN | Type of Business |
|---|---|---|
| Consulting | none | Engineering |
| | | |

List the amounts owed to you or your business:

| Name | Address | Amount Owed |
|---|---|---|
| none | | |
| | | |
| | | |
| | | |
| | Total Amount Owed | |
| | Amount Available To Pay Immediately | |

If your business accepts credit card payments provide the name of the individual or business on the account and type of credit card.

| Name on Account | Card Type | Issuing Bank Name and Address | Account Number |
|---|---|---|---|
| none | | | |
| | | | |
| | | | |

Have you filed bankruptcy?   Yes   ✔ No   If yes, what chapter and file date?

Notes (use this space to provide an explanation of assets, income and expenses which require specification or additional space)

(1) I have an outstanding judgment against me of $13,239,000 which is being pursued vigorously by Passport Management LLC.

(2) I have an outstanding judgment against me of $3,650,000 owed to my ex-wife which is being pursued vigorously by her.

(3) I have an outstanding balance of approximately $3,250,000 owed to the IRS which I am attempting to settle. The payments to the US Treasury dept are not part of that, but rather are penalties from another adjudication with the Treasury Dept.

(4) My business expenses are intermixed with my personal expenses in my bank account since my credit is so bad I have been unable to open a separate business checking account (see summary attached).

(5) I also have substantial alimony child support due every month and substantial legal expenses.

### Franchise Tax Board Privacy Notice

To learn about your privacy rights, how we may use your information, and consequences if you do not provide information we request, go to **ftb.ca.gov/Forms** and search for **1131**. To request this notice by mail, call 800.338.0505 and enter form code **948** when instructed.

### Rights as a Taxpayer

The California Taxpayers' Bill of Rights (R&TC Sections 21001-21028) requires that we adequately protect the rights, privacy, and property of all California taxpayers during the process of assessing and collecting taxes. Our goal is to make certain we protect your rights. We want you to have the highest confidence in the integrity, efficiency, and fairness of our state tax system. FTB 4058, *California Taxpayer's Bill of Rights*, includes information on state taxpayers' rights. Get FTB 4058 at **ftb.ca.gov** or call us at 800.338.0505 (select Personal Income Tax), or mail us at FRANCHISE TAX BOARD, PO BOX 942840, SACRAMENTO CA 94240-0040.

**I (we) declare under penalty of perjury under the laws of the State of California that this Financial Statement is true, correct, and complete.**

| Taxpayer's Signature | Spouse's/RDP's Signature | Date |
|---|---|---|
| X | X | 24 FEB 2019 |

FTB 3561C PC (REV 0/ -2018)   PAGE 3

EXHIBIT 10



OBSERVATIONS

CARIBBEAN Community | SAINT CHRISTOPHER (ST. KITTS) AND NEVIS

## Saint Christopher (St. Kitts) and Nevis

PASSPORT

| | | |
|---|---|---|
| TYPE | COUNTRY CODE | PASSPORT NO. |
| P | KNA | R0018636 |

SURNAME
OLSON

GIVEN NAMES
ERLEND MICHAEL

NATIONALITY
ST. KITTS AND NEVIS

DATE OF BIRTH

SEX
M

DATE OF ISSUE
18 JUN 2007

PLACE OF BIRTH
UNITED STATES

DATE OF EXPIRY
17 JUN 2017

PLACE OF ISSUE
BASSETERRE, ST. KITTS

P<KNAOLSON<<ERLEND<MICHAEL<<<<<<<<<<<<<<<<<<<
R0018636<5USA6304250M1706170C<8135<<<<<<<<30

EXHIBIT 11



**SK&N**

St Kitts & Nevis
CITIZENSHIP BY INVESTMENT

## Citizenship by Investment Unit

1st Floor, Ministry of Finance Building, Golden Rock, P. O. Box 597, Basseterre, St. Kitts and Nevis

**Your Ref: WRGOV1/2025**                                    **CONFIDENTIAL**

16th January, 2025

Insp. Jerry Watt
Supervising Officer
White Collar Crime Unit
2nd Floor Ministry of Finance Bldg.,
GOLDEN ROCK

Dear Sir,

### Request for Information

Your letter dated and received 15 January, 2025 refer.

Please be advised regarding the subjects of your inquiry:

### 1. ERLEND OLSON (D.O.B ██████████)

We confirm that **Erlend Olson** ████████████████ **(main applicant)** has been a citizen by investment since June, 2007. Subject's investment vehicle was through Sugar Diversification Foundation in the Value of Investment amount US$250,000.00.

There are no records of financial assets, bank accounts or other representations of financial holdings on record in support of the application process.

There are no other pending applications or requests being considered in relation to the subject of your request.

Please kindly note further that no information regarding the passport application process is held on record at the Citizenship by Investment Unit; such information may be accessed from the Ministry of National Security.

Should you require our further assistance, please do not hesitate to contact the undersigned.

Yours sincerely,

Damille James (Mr)
Board of Governors
Citizenship by Investment Unit

# EXHIBIT 12

Message

| From: | Erlend Olson [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8D518969227E445A9866003D3D450557-EOLSON] |
| Sent: | 6/30/2020 2:32:50 PM |
| To: | Serge |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=4be44c95b52f45d3b8186e42c29e0d1c-smontacq] |
| CC: | John Gallagher [/o=ExchangeLabs/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=686c8e8ae44e4570ab5cfb26b710d531-jgallagher] |
| Subject: | Re: Current Situation |

Serge,

If all goes well, we will be able to turn Thales on with funds at end of July. Perhaps sooner. But, it will require that we make the changes to the contract that Joe and Johanne were working on, and that we are able to come to Cannes or Paris and meet with them.

Regarding meeting, I see that the US has been barred from EU for most purposes, but perhaps we can come on an essential worker pass? Can you look into the detail on your end please?

Also, I have the option of coming in from St. Kitts and Nevis as a St. Kitts and Nevis citizen. John could perhaps travel as an Irish citizen. We would need to know how carefully they investigate our actual home or residence on landing. John and I could certainly "reside" at Paul's house in Dublin Ireland too, if that works.

Re Oman, we will accelerate now. Can you tell us whom we might meet in or from Oman soon?

-E



CONFIDENTIAL AND FOIA EXEMPT

EXHIBIT 13

**From:** erlendolson@yahoo.com
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** 9/19/2015 8:20:41 PM
**Subject:** Re: Passport v. Olson - OC Superior Court, Case No. 346521 - Order and Judgment of Contempt



I would add that J▮▮producing her passports (even if she does, in fact, produce them all) does little to stop her from fleeing. Her most likely course of action is to go to SKN on a private yacht. Her former (current?) boyfriend, ▮▮▮▮▮▮▮, who is a fugitive in California, has worked extensively on charter yachts in Florida, which is where she met him. It would only be a couple day trip, and J▮▮ probably has the cash on her to pay for it straight away, if she didn't get a ride in exchange for favors anyway. On arrival in SKN sans passport, she will say she lost her passport and obtain a new one, since she is a citizen of that country. As you may know, an SKN passport allows visa-free travel more countries than just about any passport but maybe a UK passport (since SKN was a British protectorate).



Erlend Olson

EXHIBIT 14

**From:** Erlend Olson [erlendolson@yahoo.com]
**Sent:** 6/14/2022 2:12:18 PM
**To:**
**Subject:** For avoidance of any doubt...



For avoidance of any doubt, our conversation was in NO WAY intended to suggest that anyone should do, or fail to do, anything they think they should or that they have been ordered to do or whatever. I am NOT interfering in any way with any investigation in any way, nor should anyone construe that I am attempting to.

I was simply giving you context that the IRS CI is paying a "scorched earth" game IN MY OPINION, and that game is because they have, shall we say, great difficulties in that the entire action they took was based on self-dealing liars (even if once removed) who were so blinded by their desire to "be heros" that they used the IRS for their own purposes. That is clear and proven now, even if the IRS is not fully aware of what we know.

I also know that the buyer has great plans and my understanding is he will likely give opportunity to those who supported him closing and getting everyone paid so the programs could proceed as envisaged. Conversely, those who contributed to making things more difficult to keep the core team intact to realize the future he is paying everyone fully for, would not be people he would want to work with in the future. I do not represent the buyer in any way, so that is not anything more than my opinion, though.

So, it would be suggested by some that those who get subpeonas from Sublett excercise their due process rights according to the best and proper way that preserves their potential future with all things that could become very positive. That's all.

But again, just my opinions. I have zero control or representation of anyone, so people should always do as their counsel or conscience or the law suggests, not what I suggest.

For avoidance of doubt.

-E

# EXHIBIT 15

I was thinking "in writing" was best as well to address the matter you know about, and nothing else whatsoever. Agree that you should stay out of the fray. Also I don't think its useful to talk about Gold this and Gold that, only that the "counterparty represented that he had the necessary fungible assets set aside and earmarked for the program to which he had committed with us and it was verified by our trusted staff in-country". That's it.

And then the team verified with you and you verified it then to me. THat's the chain that matters here.

I think its helpful what you said to me that "the only person who ever lied to you from the C suite was Buscher" but that's another matter...

9:28 AM

Part of MY strategy (doesn't have to be yours and isnt' yours of course) is that these crap-heads in DoJ don't even understand the key elements of what they don't know. As you say, the fact that they never ever asked you (or anyone else) as to the veracity of the MPP relationships is because they just took Buscher's representations hook-line-and-sinker. Be aware that the former AUSA (no longer on the case now) said to my lawyer that they thought the entire MPP program was "make believe" and there were not ANY contracts or anything at all. All made up. We can discuss the credit worthiness of counterparties, but they cannot question that it was real.

9:32 AM

OK. Good on the gold but as you know I have never seen the contract (by choice) so I was assuming that it was mentioned. If not? Then great. P

9:33 AM

Well you were copied on it back and forth, and you read it many times to tell me about certain terms and conditions that were a problem, not being met, whatever... not being gruff, just reminding you... anyway... but yes do also remember that there was discussion about Rex turning whatever he had (we didn't need to know what quality, where, etc) into cash, and that process was underway and verified by our team. That's what I cared most about myself at the time. Anyway, we can work together with my lawyer on the written version. As I said before I think by far its best, and you can lodge it with them. Now they may say they do NOT want your written statement, which will mean something too, but we cross that bridge when we get to it.

scam). He will add, "Although I fully intend to finish out my term in good health, should that not happen she will be ready to step into my shoes, and if -- as I expect -- I fill out my full term she will be one of the best prepared candidates to contest the 2028 election."

4:06 PM


Outgoing voice call · 9:07 PM

Call Again


Tue, Apr 2


One concern is that Sublett will not get back to you so he can control the timing and narrative as he sees fit... in other words not exactly ignoring you but not taking in your inputs as they come, only later when he wants them and has already "gone past" a place he is in now. I can't say a whole lot more, but it might be a good idea to email him your missive as-is with a note saying you will sign it formally "per our conversation as soon as you send me the proper validiction language you need above my signature but in the mean time you now have my statement on the matter". Something like that. That way he cannot avoid the truth any longer. Consider that if you would. I know some other things going on that I won't say, but he is under no obligation to help you hurt his narrative, and it wo... Read more

10:31 AM


I prefer to give him a few days, then explain that I am preparing for the state visit and want to get things off my plate, all of which is true. P

11:25 AM


Okay well they are concluding some matters this week in their process so would love for them to have your inputs before Thu. Thanks.

11:25 AM


Humm, OK Weds evening then. P

11:26 AM


Thanks. They are interviewing some "friends and family" today in DC, which is what they wanted to do with you too...

11:27 AM

Wed, Apr 3

Outgoing voice call · 2:02 PM

Incoming voice call · 2:03 PM

Call Back

docx

FBI Affadavit PS-EO Edit2.docx

22 KBSimple edit in black italics.  P

2:31 PM

Thanks. All fine as far as I am concerned. Obviously remove the italics and might be best if you did not leave the "EO" in the name of the file of course ha ha ha ha (I mean not ha ha ha of course).

2:35 PM

is my plan...

2:35 PM

Please do send and then copy me what you sent on email after the fact so I can make sure my lawyer has the exact thing you said as sent, even if you find typos left later, etc.... THANK YOU SO MUCH

2:35 PM

Hope it works out !  P

docx

10:29 AM

Got it. Thanks makes sense!

10:32 AM

FYI Sonny has already indicted his willingness to run USNC Tech based in Wash DC (a separate but wholly-owned company). USNC is planning a 7 person board with ████████ (we hope) as chairman, and Tiffanny on the board. I think I told you about Lyles (4 stars with a nuke engineering degree), and you know Tiffanny well enough. FYI she won the "Defense Industry CEO of the Year" award last year or the year before. She tripled the size of Novetta and Carlyle sold it for an obscene profit. P

10:39 AM

Tiff is absolute badass rock star. Without question she did magic. At the right time I want her on my board. You know the royal "me" so to speak. You mean ████████████ ?

10:43 AM

Right, former MDA chair amongst other things. And the good news is that Jeff and Sonny are good friends of his. P

10:45 AM

By the way, if you want to "delay" things with the IRS, one way to do it is to have your lawyer state to them that you are "generally supportive" which does not mean anything other than to lay foundation for the next sentence which is "My client Peter Schafer has no interest in telling you details which you use to then implicate him in whatever crazy narrative you are cooking up, thus if you want to interview him, you must provide him immunity" which will then take weeks to sort out... just an idea, of course I am in no way offering you any advice nor suggesting in any way that you thwart any efforts by DoJ in any way whatsoever.

good re Lyles. Maybe we have two boards of similar composition at some point... ha ha ha

10:46 AM

I am sure Tiff would be pleased to consider your board. BTW when will your announcements begin to unwind the prosecution? I would love to have them lose interest. PS

5:43 PM

Sublet just turned down my request to reschedule. Jerks. P

6:11 PM

You really have to get a lawyer to call them and insist on immunity... it's the only way to delay. Clearly they are fucking with you.

6:15 PM

Well to be fair Sublet said he didn't have the authority I had to go to Ms Ross (?).

Just for my peace of mind and marriage tranquility do you think T2 will eventually cover my legal fees?

6:18 PM

Without question

Have the lawyer call Ross she will delay

6:26 PM

Ok thx

7:23 PM

I just signed a tolling agreement giving them another year. They should not be in such a rush now.

7:33 PM

Not sure I understand

7:40 PM